**[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 378.]**

**THE STATE OF OHIO, APPELLEE, *v*. MADRIGAL, APPELLANT.**

**[Cite as *State v. Madrigal*, 2000-Ohio-448.]**

*Criminal law—Aggravated murder—Death penalty upheld, when—Evidence— Hearsay statements deemed sufficiently reliable to allow their admission into evidence without benefit of cross-examination, when—Accomplice's confession that inculpates a criminal defendant is not within a firmly rooted exception to the hearsay rule—Out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence, when.*

1. Hearsay statements are deemed sufficiently reliable to allow their admission into evidence without the benefit of cross-examination when the statements (1) fall within a firmly rooted hearsay exception, or (2) contain adequate indicia of reliability. (*Ohio v. Roberts* [1980], 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608, followed.)

2. An accomplice's confession that inculpates a criminal defendant is not within a firmly rooted exception to the hearsay rule as that concept has been defined by Confrontation Clause jurisprudence. (*Lilly v. Virginia* [1999], 527 U.S. ___, ___-___, 119 S.Ct. 1887, 1898-1899, 144 L.Ed.2d 117, 132-133, followed; *State v. Gilliam* [1994], 70 Ohio St.3d 17, 635 N.E.2d 1242, to the extent inconsistent herewith, overruled.)

3. Out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence if the statement satisfies the second prong of the test announced in *Ohio v. Roberts, supra*.

(No. 97-98—Submitted July 28, 1999—Decided January 5, 2000.)

APPEAL from the Court of Common Pleas of Lucas County, No. CR96-5761.

————————————

{¶ 1} Jamie R. Madrigal, defendant-appellant, was charged and convicted of aggravated murder committed during an aggravated robbery with a felony murder specification and a separate count of aggravated robbery. Both counts carried a gun specification. The jury recommended that Madrigal be sentenced to death, and the trial court adopted the jury's recommendation.

{¶ 2} On April 12, 1996, a Friday evening, Misty Fisher, Eric Armstrong, Brian Conley, and Carrie Tracy were working at a Kentucky Fried Chicken restaurant ("KFC") in Toledo. Tracy was sixteen years old, and the other three were eighteen years old. Fisher and Armstrong were both closing managers. Around 8:15 p.m., a black male entered the restaurant. Tracy was working at the front counter and asked the person if she could help him, but he said "No, no." After looking around the restaurant, the person exited.

{¶ 3} Jeffrey Kerekes and Todd Corbett were on their dinner break from work and decided to go to the KFC for dinner. As they pulled into the drive-thru, they realized that the speaker was not working and drove up to the window. Tracy came over to the window to take their order.

{¶ 4} The same black man who had previously been in the KFC returned. A loud crash caught everyone's attention as the man jumped over the counter, shattering the glass on the refrigerated counter case. The man hit Armstrong in the head and ordered everyone to the floor. The man asked who the closing manager was, and Armstrong said he was. Armstrong was then ordered to get up and get the money out of all the registers. He did as he was told and put the money in a KFC bag on the counter. The man then told Armstrong to open the safe, but Armstrong told him he did not have the combination. When the man asked why he did not have the combination if he was the closing manager, Armstrong told him that Fisher had the combination. The man grabbed Fisher by her ponytail and took both her and Armstrong back to the safe.

{¶ 5} Armstrong was told to get on the floor, and Fisher was ordered to open

2

the safe. Fisher knelt in front of the safe, and the man held a gun to the back of her head. She was scared and nervous, and said she could not get the safe open. The man said "hurry up bitch." Fisher asked Armstrong to help her, but as he got up, the man ordered him back to the floor. When she still could not get the safe open, the man said "Now you're playing, bitch" and shot her in the back of the head. The man exited through the back door. Armstrong immediately got up and called 911.

{¶ 6} Meanwhile, as Corbett and Kerekes were waiting for their order, they saw a man jump over the counter and hit Armstrong. They saw a chrome-plated gun in the man's hand. Realizing the KFC was being robbed, they pulled through the drive-thru and drove around the front of the building. They noticed a man sitting on the driver's side of an older maroon Buick with chrome Cragar SS rims, which was parked against the back fence of the KFC parking lot. The car was backed into the parking spot, and there was no license plate. Corbett and Kerekes pulled around to the alley behind the KFC parking lot. Kerekes got out and looked both under and over the fence, looking for a license plate on the back of the car, but there was none.

{¶ 7} Kerekes got back in the car, and he and Corbett drove down to a 7-Eleven Store and asked the clerk to call the police and tell them a robbery was in progress at the KFC. They then proceeded back to the KFC. As they pulled into the parking lot, they noticed that the car was still parked in the same spot; however, the man in the car was now in the passenger seat. They drove around the parking lot, and as they came to the back door, the door opened and a black man came out carrying a brown paper bag in his hands. The man stopped momentarily and looked at them, then got into the maroon car and took off. Corbett and Kerekes again proceeded through the drive-thru lane. This time Tracy was hanging out the window screaming that someone had been shot.

{¶ 8} Corbett and Kerekes went into the KFC as the police and ambulance were arriving. Fisher died on the way to the hospital from the gunshot wound to

her head.

{¶ 9} Corbett and Kerekes gave the police a description of the car and the direction it headed, but the police were unable to locate it that night. The police took statements from Corbett and Kerekes and then took the three employee witnesses to the police station for their statements. The witnesses described the man as a black man, medium complexion, in his late teens, early twenties, medium build, short hair, wearing tan boots, a dark-colored hooded sweatshirt, and baggy pants. Kerekes described the baggy pants as jeans, while Tracy described them as brown "Dickies" brand pants with cuts on the legs.

{¶ 10} The following day, Corbett and Tracy were asked to return to the police station to attempt to create a composite sketch to help generate leads in the case. As a result of leads coming into the police station, James Jordan was arrested.

{¶ 11} On the Monday following the crime, the witnesses were asked to come to the police station to participate in a lineup. Neither Corbett nor Kerekes picked anyone from the lineup. Tracy picked out Jordan, even though she thought he was too short. She later indicated that she picked him only because she thought she was supposed to pick someone out.

{¶ 12} Also on Monday, Corbett contacted his father, who was employed at the Lucas County Sheriff's Department, and told him that he thought the police were looking for the wrong car, and indicated he needed to get a picture of the car to show police. His father went to the local Buick dealership and got some books of older model cars and brought them to Corbett and Kerekes to look through. They found a picture that resembled the car they saw at the KFC, and turned it over to police. Police received a crime-stoppers tip that a Jamie Madrigal had purchased such a car and that the car they were looking for was at a house on Alldays Street. Detective Robert Leiter, the chief detective investigating the case, went out to look at the vehicle.

{¶ 13} After observing the vehicle, Leiter knocked on the door of the house

and talked to Tina Boyd. He learned that Jamie Madrigal, Tina's boyfriend, owned the car. He then inquired as to Madrigal's whereabouts and obtained some names and addresses.

{¶ 14} On the Tuesday morning following the murder, Toledo police took Corbett to look at the vehicle at the Alldays address, and Corbett identified it as the car he saw in the KFC parking lot. A search warrant was obtained and the car was seized.

{¶ 15} Boyd contacted Leiter on Tuesday with the names of more of Madrigal's friends (Dennis Crawford and Chris Cathcart). Police officers went out and interviewed the persons whose names Boyd had provided. When the officers talked to Crawford, they learned that Crawford, Cathcart, and Madrigal were together at Madrigal and Boyd's house on the previous Friday night. Crawford evidently told the officers that his girlfriend picked him up, leaving Madrigal and Cathcart at the house.

{¶ 16} Cathcart was then brought in for questioning. Cathcart gave two statements to the police, both implicating Madrigal in the robbery of the KFC and the murder of Fisher. Cathcart admitted that he was the person in the car, while Madrigal was in the KFC.

{¶ 17} After Cathcart gave his statements, he was arrested, an arrest warrant was issued for Madrigal, and a search warrant was issued for the Alldays Street address. During the search of the premises, a pair of work boots, men's maroon pants, and a blue hooded sweatshirt were seized.

{¶ 18} On Thursday morning, Boyd told police that Madrigal was in Cleveland. Evidently, Madrigal left Toledo in the early morning hours after the murder and went to the home of Rodney Pettiway (his half-brother) and Pettiway's girlfriend. He stayed there until early the following week. Madrigal saw the Toledo Blade newspaper at Pettiway's house and commented to Pettiway that "he wanted to get it." After his arrest, Madrigal contacted Pettiway from the county jail and

asked him if he had "ratted him out."

{¶ 19} FBI agents and police in Cleveland executed the arrest warrant on Madrigal, who was at the house of Tavio Burton. Police forcibly entered through the back door of the house. After stating why they were there, Burton motioned the officers to the living room area, where Madrigal was sitting on the couch. He was arrested and taken into the kitchen area, where he was searched and advised of his rights.

{¶ 20} Police conducted a "wing-span" search of the area surrounding the couch. They received a written consent to search the house from Burton. They asked Burton where Madrigal's belongings were, and were directed to a closet next to the couch. A cloth suitcase and duffel bag were seized. Several pairs of brown "Dickie" pants, with the cuffs cut, were found in one bag. When police opened another bag, they found a nickel-plated revolver resting on top, and a bullet in the bag.

{¶ 21} Madrigal was taken back to Toledo. A photograph was taken of him when he was "booked," and the police put together a photo array including Madrigal and five other black males. The photos were taken to Corbett, Kerekes, and Tracy to see if they could make an identification. Both Corbett and Tracy picked Madrigal's photograph out of the array. Kerekes did not pick out a photo, indicating that he thought the quality of the photos was very poor. All three identified Madrigal in court.

{¶ 22} When Madrigal was arrested, he had a mustache and some facial hair. These features also appeared on his Ohio Identification Card, which was found in his coat pocket. When the witnesses to the offense were interviewed, none of them described the suspect as having a mustache or any facial hair, and the question of identity became the main focus of the defense case.

{¶ 23} During the course of the investigation it was learned that both Madrigal and Cathcart had worked at the same KFC (although not at the same time)

that was robbed. Madrigal had worked the closing shift and knew the procedures for closing the store.

{¶ 24} Madrigal's fingerprints were not found at the KFC, and the experts who examined the gun that was seized during Madrigal's arrest could not state with certainty that it was the murder weapon, nor could they exclude it as the murder weapon. At Madrigal's trial, Cathcart asserted his Fifth Amendment right against self-incrimination, and therefore did not testify; however, his statements were admitted into evidence, over defense objection.

{¶ 25} The jury deliberated about eight hours before returning a verdict of guilty on all charges. The jury recommended that Madrigal be sentenced to death, and the trial court adopted the jury's recommendation.

{¶ 26} The cause is now before this court upon an appeal as of right from the court of common pleas.

————————————

*Jeffrey M. Gamso* and *James W. VanDeilen*, for appellant.

*Julia Bates*, Lucas County Prosecuting Attorney, *Dean Mandross* and *Brenda J. Majdalani,* Assistant Prosecuting Attorneys, for appellee.

————————————

**MOYER, C.J.**

{¶ 27} In this appeal, Madrigal raises seventeen propositions of law. Finding no reversible error, we affirm his convictions. In addition, we have independently reviewed the record, weighed the aggravating circumstance against the mitigating factors, and examined the proportionality of the death sentence in this case in comparison to the penalty imposed in similar cases. Upon a complete review of the record, we affirm Madrigal's convictions and sentences.

Admission of Co-Defendant's Statements

**{¶ 28}** Chris Cathcart was an accomplice to the robbery of the KFC and murder of Misty Fisher. Cathcart remained in the car while Madrigal went into the KFC to carry out the robbery in which Fisher was killed. After Cathcart was arrested, he gave two audio-taped statements to the police. In both statements he implicated Madrigal in the robbery-murder. In the first statement, Cathcart denied knowing anything about a planned robbery of the KFC. He told police he was at Madrigal's house and Madrigal asked him to go over to a "girl's" house with him. He rode with Madrigal, and fell asleep in Madrigal's car and when he woke up, he was at the KFC. Madrigal jumped into the car and they drove off. Cathcart found out about the robbery-murder the next day on the news. At the conclusion of the first statement, Cathcart told the police everything he told them was the truth.

**{¶ 29}** The second statement was taken on the same day, approximately four hours after the first. In his second statement Cathcart told police that he knew that Madrigal was going to rob the KFC and that Cathcart agreed to ride along with him. Madrigal went into the KFC and came out three to five minutes later, but would not say what happened while he was in the KFC. They went back to the house and counted the money, which was around $300.

**{¶ 30}** The state called Cathcart during its case in chief; however, Cathcart had not yet been tried and invoked the Fifth Amendment, refusing to testify. Defense counsel objected to the admission of the statements, but the trial court allowed both statements, in their entirety, to be read into the record.

**{¶ 31}** In his fifth proposition of law, Madrigal argues that the trial court erred when it allowed the state to read into evidence the taped statements of Cathcart, who refused to testify at trial. Madrigal claims the out-of-court statements were inadmissible hearsay. Madrigal argues that admission of these statements violated his right to confront the witnesses against him as secured by the Ohio and federal Constitutions. The trial court permitted the admission of Cathcart's

statements pursuant to Evid.R. 804(B)(3) and on the authority of *State v. Gilliam* (1994), 70 Ohio St.3d 17, 635 N.E.2d 1242.

{¶ 32} Evid.R. 804(B)(3) states in part:

"(B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

" * * *

"(3) Statement against interest. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

{¶ 33} Pursuant to Evid.R. 804(B)(3), the trial court erred in admitting the first statement into evidence. Cathcart's attempts to portray himself as the innocent bystander do not qualify as a statement against interest and should have been excluded. His second statement, while also tending to minimize his own involvement, could qualify as an exception to the hearsay rule.

{¶ 34} However, even if Cathcart's statements fit within an exception to the hearsay rule, his statements may still be excludable as a violation of Madrigal's Confrontation Clause rights. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

{¶ 35} "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig* (1990), 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666, 678. In cases such as this, where the declarant remains unavailable at trial and the state

seeks to offer his out-of-court statements against the accused, we must decide whether the Confrontation Clause permits the state to deny the accused his usual right to force the declarant to submit to cross-examination.

{¶ 36} The state may deny the accused the right to cross-examination without violating the Confrontation Clause if the court deems the proffered out-of-court statements to be "so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability." *White v. Illinois* (1992), 502 U.S. 346, 357, 112 S.Ct. 736, 743, 116 L.Ed.2d 848, 860. That is, the right to confrontation is not absolute and "does not necessarily prohibit the admission of hearsay statements against a criminal defendant." *Idaho v. Wright* (1990), 497 U.S. 805, 813, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638, 651. Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) "[fall] within a firmly rooted hearsay exception," or (2) contain " 'adequate indicia of reliability.' " *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608. Therefore, to be admissible, Cathcart's statements must meet one of the prongs of *Roberts*.

{¶ 37} The trial court, in making the *Roberts* determination, relied on our decision in *Gilliam*, which held that "[t]he reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception." *Gilliam*, 70 Ohio St.3d at 19-20, 635 N.E.2d at 1245. There, we found that a statement against interest was a firmly rooted hearsay exception, and allowed the statement to be admitted.

{¶ 38} However, in *Lilly v. Virginia* (1999), 527 U.S. ___, 119 S.Ct. 1887, 144 L.Ed.2d 117, an opinion issued during the pendency of this appeal, the United States Supreme Court explicitly considered the use of statements against penal interest offered by the prosecution in the absence of the declarant to incriminate a criminal codefendant. The court held that such statements do not categorically satisfy Confrontation Clause concerns. See *id., 527 U.S. at ___*, 119 S.Ct. at 1899-

1901, 144 L.Ed.2d at 133-136.

{¶ 39} Justice Scalia, concurring separately, took the most resolute stance against the use of such statements, calling it "a paradigmatic Confrontation Clause violation." *Id.,* 527 U.S. at ___, 119 S.Ct. at 1903, 144 L.Ed.2d at 138. The four-member plurality took a more nuanced approach. It divided the category of statements against penal interest into three subcategories: (1) those used as voluntary admissions against the declarant; (2) those used as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) those used as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. *Id.*, 527 U.S. at ___, 119 S.Ct. at 1895-1897, 144 L.Ed.2d at 128-131. The plurality recognized that statements in this last category—like those at issue here—do not fall into a firmly rooted hearsay exception. *Id.,* 527 U.S. at ___, 119 S.Ct. at 1899, 144 L.Ed.2d at 133.

{¶ 40} In so doing, the plurality observed that the court had "over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.' " *Id.*, 527 U.S. at ___, 119 S.Ct. at 1897, 144 L.Ed.2d at 131 (quoting *Lee v. Illinois* [1986], 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526). It reaffirmed the court's prior recognition that " 'th[e] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. * * * "Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." ' " *Id.*, 527 U.S. at ___, 119 S.Ct. at 1898, 144 L.Ed.2d at 131.

{¶ 41} After examining its previous cases concerning admission of co-defendant's statements, the court concluded:

"It is clear that our cases consistently have viewed an accomplice's

11

statements that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.' *White* [*v. Illinois* (1992),] 502 U.S. [346] at 357 [112 S.Ct. 736, 743, 116 L.Ed.2d 848, 860]. * * * *The decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence."* (Emphasis added.) *Lilly*, 527 U.S. at ___, 119 S.Ct. at 1898-1899, 144 L.Ed.2d at 132-133. The holding of the Supreme Court in *Lilly* requires us to overrule the contrary holding in *State v. Gilliam*, that a "statement against interest," under Evid.R. 804(B)(3), falls into the "firmly rooted hearsay exception."[1] This, however, does not impose a " 'blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant.' " Rather, out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence if the statement satisfies the second prong of the test announced in *Ohio v. Roberts, supra; Lilly,* 527 U.S. at ___, 119 S.Ct. at 1899, 144 L.Ed.2d at 133, fn. 5.

{¶ 42} The statements would be admissible only if they exhibit a guarantee of trustworthiness or indicia of reliability. Yet, this type of statement has consistently been deemed " 'presumptively unreliable.' " See *Lilly*, 527 U.S. at ___, 119 S.Ct. at 1897, 144 L.Ed.2d at 131 (citing *Lee*, 476 U.S. at 541, 106 S.Ct. at 2062, 90 L.Ed.2d at 526). While the Supreme Court has clearly stated that "the presumption of unreliability that attaches to codefendants' confessions * * * may be rebutted," *Lee*, 476 U.S. at 543, 106 S.Ct. at 2063, 90 L.Ed.2d at 527, the more recent *Lilly* plurality cautions us that "[i]t is highly unlikely that the

---

1. The determination of whether a co-defendant's statements are against penal interest is a question of state law; however, whether the statements fall within a "firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law." *Lilly*, 527 U.S. at ___, 119 S.Ct. at 1894, 144 L.Ed.2d at 127.

presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice— that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." *Lilly*, 527 U.S. at ___, 119 S.Ct. at 1900, 144 L.Ed.2d at 135.

{¶ 43} Here, the state's arguments for trustworthiness relied solely on the fact that other evidence submitted corroborated Cathcart's statements.[2]   These same corroborating circumstances were cited by the trial court in admitting the statements.   Yet *Lilly* holds that the fact that other evidence corroborates the statements is irrelevant. *Lilly*, 527 U.S. at ___, 119 S.Ct. at 1900-1901, 144 L.Ed.2d at 135.   The relevant circumstances include "*only those that surround* the making of the statement and that render the declarant particularly worthy of belief." (Emphasis added.)   *Idaho v. Wright,* 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655.   The circumstantial guarantees of trustworthiness are those that exist at the time the statement was made and do not include those that may be added by using hindsight. *Id.*, 497 U.S. at 820, 110 S.Ct. at 3149, 111 L.Ed.2d at 655.

{¶ 44} Cathcart's statements comprised seventy-nine pages of transcript. An independent examination of the record for trustworthiness reveals that Cathcart's first statement contains no elements of trustworthiness.  In fact, Cathcart himself indicated that he had lied to Leiter in the first statement.   The second statement also fails the trustworthiness test.   While the second statement is corroborated by other evidence, *Lilly* holds that that is simply not enough.  Further, the statement indicates a desire on Cathcart's part to minimize his involvement and place the sole blame for the crime on Madrigal.  It cannot be said that Cathcart's "truthfulness is so clear from the surrounding circumstances that the test of cross-

---

2.  At oral argument, counsel for the state conceded that under *Lilly* the statement should have been excluded, but argued instead that the admission of Cathcart's statements was harmless error.

examination would be of marginal utility." *Id*. at 820, 110 S.Ct. at 3149, 111 L.Ed.2d at 655. In fact, Madrigal's defense attempted to place the blame for the crime on Cathcart, which would have made the need for cross-examination even more crucial to the case.

{¶ 45} Because the admission of the statements violated Madrigal's Confrontation Clause rights, the final inquiry is whether the Sixth Amendment error was "harmless beyond a reasonable doubt." This inquiry is not simply a sufficiency of the remaining evidence inquiry; rather, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Chapman v. California* (1967), 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 710.

{¶ 46} The strength of the state's case was found in the testimony of the eyewitnesses. Included in the eyewitness testimony is the out-of-court identification of Madrigal by Tracy and Corbett, as well as the in-court identifications by Tracy, Corbett, Conley, and Kerekes. The testimony of these witnesses was credible and compelling, compared to Cathcart's statements, which were self-serving and lacking in credibility. Therefore, the admission of Cathcart's statements, while error, was harmless beyond a reasonable doubt. His fifth proposition of law is overruled.

Failure to File Motion to Suppress

{¶ 47} On September 4, 1996, Madrigal filed a motion for leave to file a motion to suppress evidence. At a September 25, 1996 hearing, defense counsel requested to withdraw the motion for leave, which was granted.[3]

---

3. During the trial phase, after the defense case, but prior to the state's rebuttal, defense counsel asked for a bench conference and submitted a memorandum under seal to the court. Defense counsel indicated that the memorandum was being sealed "for purposes of any appellate review. And it would address any assistance of counsel issues that may come up should the case proceed to that point." On September 2, 1998, the state filed a motion for release of portion of record under seal so as to use the sealed portion of the record in its brief. Madrigal filed a memorandum in opposition to the motion on September 14, 1998. We denied the motion. *State v. Madrigal* (1998), 83 Ohio

{¶ 48} In his first proposition of law, Madrigal argues his trial counsel were ineffective because they failed to attempt to suppress evidence seized when he was arrested at the Cleveland apartment. One item of evidence seized was a gun similar to the weapon used in the murder of Fisher. Experts for both parties examined the gun and came to inconclusive results; neither expert could definitively say it was the gun used, nor could they say that it could not have been the gun used. Nonetheless, Madrigal argues that had defense counsel pursued a motion to suppress, it would have been granted and the gun would have been excluded from the jury's consideration.

{¶ 49} To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Strickland* at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

{¶ 50} "[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 325. In evaluating the first prong, the court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland* at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Unlike the factual situation presented in *Kimmelman*, this record demonstrates that defense counsel had fully investigated this case and were aware of the facts surrounding Madrigal's arrest. Filing a motion to suppress is not without risks, and the fact that counsel

---

St.3d 1437, 699 N.E.2d 950. The contents of the sealed portion of the record were not used in deciding this issue.

filed a motion for leave to file the motion to suppress, and later withdrew that motion, is compelling evidence of a tactical decision. It is not mere speculation to presume that defense counsel obtained information concerning the suppression motion that led to its withdrawal. Further, the "adversarial testing process" worked to Madrigal's benefit. The gun that was seized during Madrigal's arrest was never conclusively tied to the murder in this case. Through cross-examination of the state's expert, as well as the presentation of his own expert, Madrigal's counsel were able to show that the gun was not necessarily the murder weapon.

{¶ 51} Madrigal assumes that the inquiry for the court is whether the motion to suppress would have been granted had it been filed, as if a probable granting of the motion to suppress meets the prejudice prong. However, assuming *arguendo* that counsel should have filed the motion, Madrigal cannot meet the prejudice prong of *Strickland*, that is, there exists "a reasonable probability that absent [Madrigal's attorneys'] errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland* at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *Kimmelman* at 391, 106 S.Ct. at 2591, 91 L.Ed.2d at 320-330. Even assuming that Madrigal's suppression motion would have been granted, and the gun would have been excluded, compelling evidence against him still existed.

{¶ 52} Madrigal admits that there were "three central categories of evidence against him * * * (1) identification testimony by eyewitnesses, (2) a statement of an alleged accomplice, and (3) his possession of a handgun which was similar in appearance to the murder weapon." Of these three categories, the evidence surrounding the gun was the state's weakest. The exclusion of this evidence does not create a reasonable probability that the factfinder would have had a reasonable doubt respecting guilt. As set forth *supra*, Madrigal challenged the admission of the accomplice's statements. Even though we find that this evidence should have been excluded, this would not change the outcome of this issue given the strength of the eyewitness identification.

**{¶ 53}** The exclusion of the gun would not undermine confidence in the outcome. Madrigal has not met either prong of *Strickland;* therefore, we overrule this proposition of law.

Failure to Obtain Expert on Eyewitness Identification

**{¶ 54}** Madrigal argues in his second proposition of law that his defense counsel did not provide effective representation because they failed to obtain an expert to testify on the weakness of eyewitness testimony.

**{¶ 55}** Eyewitness testimony played an important role in the state's case against Madrigal. Two KFC employees and two customers who were in the drive-thru lane identified Madrigal as the person who robbed the store and shot Fisher. Madrigal contended that he was not the person who had committed this crime. Defense counsel pursued this defense by questioning witnesses regarding the fact that at the time this crime was committed, Madrigal had facial hair, yet none of the witnesses ever described the suspect as having facial hair. Madrigal argues that had an expert testified about the problems inherent in eyewitness identification, there is a reasonable probability that the outcome of the trial would have been different. Therefore, he asserts, he was denied the effective assistance of counsel.

**{¶ 56}** In order to prevail on a claim of ineffective assistance of counsel, Madrigal must show that counsel's performance fell below an objective standard of reasonableness and, in addition, prejudice arose from counsel's performance. See *Strickland* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. Based on the record before the court, appellant's counsel were not ineffective so as to have precluded a fair trial or to have created an unreliable result. Appellant was represented by two experienced trial attorneys who presumably were aware of the issues involving the evidence of identification. Appellant's counsel evidently decided not to request the appointment of an eyewitness identification expert, choosing instead to rely on their cross-examination of the witnesses in order to

impeach the eyewitnesses. In light of these circumstances, the errors alleged by appellant were neither so serious that his counsel were not functioning as "counsel" guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable. *State v. Thompson* (1987), 33 Ohio St.3d 1, 11, 514 N.E.2d 407, 417.

**{¶ 57}** Additionally, resolving this issue in Madrigal's favor would be purely speculative. Nothing in the record indicates what kind of testimony an eyewitness identification expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal. See *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47, 67; *State v. Scott* (1989), 63 Ohio App.3d 304, 308, 578 N.E.2d 841, 844 (claim of failure to present mitigating evidence is properly considered in a post-conviction proceeding because evidence in support of claim could not be presented on direct appeal). Accordingly, we find this proposition of law not to be well taken.

Erroneous Excusal for Cause

**{¶ 58}** In his third proposition of law, Madrigal argues that two prospective jurors should not have been excused for cause, and that defense counsel were ineffective for not objecting to the state's challenge. The two prospective jurors that Madrigal alleges were erroneously excused, expressed problems with the death penalty. Both jurors indicated concerns that if they sentenced someone to death who was later found to be innocent, they would have a hard time living with that fact. Madrigal argues that his case was tried before our decision in *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus; thus, residual doubt was still a legitimate mitigating factor that these jurors would have been able to consider in the weighing process. Further, Madrigal argues that defense counsel should have informed them of residual doubt as a mitigating factor and rehabilitated them on this aspect.

{¶ 59} The proper standard for determining when a prospective juror may be excluded for cause based on her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus; *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284. The trial court's findings may not be overruled if supported by substantial testimony. *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587.

{¶ 60} Madrigal misinterprets the questioning of these jurors. Prospective juror Carol Bartok made it clear from the moment she was questioned that she felt strongly about the death penalty. She indicated she had thought about it and she did not think she could vote to impose a death sentence. When questioned further, she stated that she could not live with the idea of giving the death penalty to an innocent man. One of the defense counsel was asked whether he had any questions, which he did not, and the juror was excused.

{¶ 61} Prospective juror San Miguel initially indicated that she did not know if she would be able to vote for the death penalty, but felt she probably could not. When questioned by defense counsel, she asserted that she was bothered by the irrevocability of the death penalty, and, further, she would not automatically vote one way or the other. While her answers were not definitive, she said that she could not guarantee that she would follow the law if her conscience led her the opposite way. The court excused her, and defense counsel objected to the excusal.

{¶ 62} In both situations, the trial court found that the jurors' views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions and oath. *Witt, supra.* The trial court properly excused each juror.

{¶ 63} Addressing the claim of ineffective assistance of counsel, defense

counsel did object to the excusal of San Miguel. While counsel did not object to the excusal of Bartok, the failure to do so would not constitute ineffective assistance. It was clear that the juror was adamant on her position and rightly excused under the *Witt* standard. This proposition of law is overruled.

Statutory Excusal for Cause

{¶ 64} In his fourth proposition of law, Madrigal argues that prospective juror Alvin Michael should not have been excused for cause. During voir dire, one of the prosecutors advised the court that Michael had a 1984 felony conviction for robbery. An assistant prosecutor in Madrigal's case had prosecuted Michael for that charge. In addition, one of the police officers in Michael's case was also a witness in Madrigal's case. The trial court excused the juror for cause.

{¶ 65} Pursuant to R.C. 2961.01:

"A person convicted of a felony under the laws of this or any other state or the United States, unless the conviction is reversed or annulled, is incompetent to be an elector or juror or to hold an office of honor, trust, or profit. When any person convicted of a felony under any law of that type is granted probation, parole, judicial release, or a conditional pardon or is released under a post-release control sanction, the person is competent to be an elector during the period of probation, parole, or release or until the conditions of the pardon have been performed or have transpired and is competent to be an elector thereafter following final discharge. The full pardon of a convict restores the rights and privileges so forfeited under this section, but a pardon shall not release a convict from the costs of the convict's conviction in this state, unless so specified."

{¶ 66} Madrigal argues that the foregoing statute provides that a convicted felon can have the right to serve as a juror restored if a full pardon is granted; therefore, Madrigal argues that Michael should have been questioned concerning whether he had been pardoned.

{¶ 67} It is unclear from the record how the information concerning the

20

robbery conviction came to light. When Michael was questioned individually, it was not discussed or brought up by either party or the court. Further, he was not dismissed from service on the record, so there is no information regarding any response to dismissal. Defense counsel indicated a desire to question him regarding any possible restoration of rights, but the trial court did not grant that request.

{¶ 68} It also appears that the trial court was very concerned that assistant prosecutor Mandross had prosecuted the prospective juror on the robbery conviction, and that seemed to weigh into its decision to excuse the juror.

{¶ 69} "The determination of whether a prospective juror should be disqualified for cause pursuant to R.C. 2313.42(J) is a discretionary function of the trial court. Such determination will not be reversed on appeal absent an abuse of discretion. (*Maddex v. Columber* [1926], 114 Ohio St. 178, 151 N.E. 56, approved and followed.)" *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. Given this record, it cannot be said that the trial judge abused her discretion. The better practice in this case would have been to question the juror, on the record, to determine the status of his previous conviction. However, the fact that the same prosecutor and police officer were involved in the case would have been enough to remove the juror for cause. Accordingly, this proposition of law is overruled.

Penalty Phase Instructions

*Brooks* Instruction

{¶ 70} The jury reached its verdict, finding Madrigal guilty of all charges on October 22, 1996. On October 23, 1996, prior to the beginning of the penalty phase, the parties discussed jury instructions. During that discussion, defense counsel brought the case of *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, to the trial court's attention. Specifically, counsel referred the court to the language in *Brooks* concerning the fact that a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case

do not outweigh the mitigating factors. *Brooks* suggests that "[j]urors from this point forward should be so instructed." *Brooks* at 162, 661 N.E.2d at 1042.

{¶ 71} The next day, defense counsel filed written requested instructions. In reliance on *Brooks*, one of the requested instructions read as follows:

"It is not necessary that you, as a jury, unanimously reject death as the appropriate sentence before considering a life sentence. There is no presumption that death is the appropriate sentence. If any one of you find that the aggravating circumstance does not outweigh the mitigating factors beyond a reasonable doubt, then you must deliberate the appropriate life sentence."

{¶ 72} Defense counsel later objected to "[t]hose portions of our proffered instructions that weren't incorporated into the Court's instructions."

{¶ 73} The trial court did not include the requested *Brooks* instruction in the jury instructions. Instead, the court instructed:

"You shall recommend the sentence of death if all 12 jurors find beyond proof—find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

"If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend either a life sentence with parole eligibility after serving 20 years of imprisonment or a life sentence with parole eligibility after serving 30 years of imprisonment."

{¶ 74} In his tenth proposition of law, Madrigal asks the court to reverse his death sentence due to the trial court's failure to include the *Brooks* instruction. The state asserts that this issue is waived, and therefore need only be reviewed under plain error. The record clearly establishes that Madrigal brought the *Brooks* case to the court's attention, both orally and in writing, and then twice entered a further objection to the court's instruction. This issue was not waived. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph one of the syllabus.

{¶ 75} We have previously addressed claimed *Brooks* error in cases that

were tried *before* the *Brooks* decision was released. In each instance the court reviewed the claimed error under plain error analysis. See, *e.g.*, *State v. Goff* (1998), 82 Ohio St.3d 123, 128-129, 694 N.E.2d 916, 921-922; *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 531; *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95-96; *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d 484, 496. Madrigal's case is the first to come to be tried *after* the *Brooks* decision and in which defense counsel specifically cited *Brooks* in making their request, which was denied by the trial court.

**{¶ 76}** We have previously held that "[i]t is prejudicial error to refuse a requested charge that is pertinent to the case, states the law correctly, and is not covered by the general charge." *State v. Hicks* (1989), 43 Ohio St.3d 72, 77, 538 N.E.2d 1030, 1037. However, the charge need not be given in the exact language requested. *State v. Scott* (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 87, 497 N.E.2d 55, 63. The trial court's instruction regarding unanimity is not quite as clear as the one requested, but pursuant to *Scott* would not require reversal. More troublesome is the fact that the trial court failed to include the following specific language from *Brooks*: "In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *Brooks* at 162, 661 N.E.2d at 1042.

**{¶ 77}** R.C. 2929.03(D)(2) provides:

"If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment." (146 Ohio Law, Part IV, 7817.)

**{¶ 78}** The instruction given by the trial court, while not including our suggested instruction, was consistent with R.C. 2929.03(D)(2). However, the actual error in *Brooks* involved a misstatement of Ohio law. Here, the jury was not instructed that they had to unanimously find that death was inappropriate before they could consider a life sentence, as they were in *Brooks*. Although the jury in this case did not receive the exact instruction from *Brooks*, the jury received the information it needed in the charge given, and the trial court did not commit the *Brooks* error. *Bey,* 85 Ohio St.3d at 498, 709 N.E.2d 484, 496.

**{¶ 79}** Our determination that the trial court's failure to include the requested instruction is not reversible error in this case should not imply that we are retreating from our reasoning in *Brooks*. We still prefer that trial courts give the instructions suggested in *Brooks*. Based on the foregoing, this proposition of law is overruled.

Weighing Instruction

**{¶ 80}** In his twelfth proposition of law, Madrigal argues that instructions given in the court's preliminary and final instructions concerning the weighing of aggravating circumstances and mitigating factors were inaccurate and shifted the burden of proof to the defendant. Trial counsel failed to object to these instructions, and therefore any error is reviewed under the plain error standard. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

**{¶ 81}** During the preliminary instructions, the court instructed:

"Very briefly, if the aggravating circumstances outweigh the mitigating factors, your sentence should be death. If the mitigating factors outweigh the aggravating circumstances, then your verdict may be life with parole eligibility after a term of twenty or thirty full years has been served."

**{¶ 82}** Later, after the presentation of evidence in the penalty phase, the trial court instructed:

"If the mitigating factors outweigh the aggravating circumstances, then your

24

verdict shall be life with parole eligibility after a term of either 20 or 30 full years has been served."

{¶ 83} Madrigal is correct that the language used by the trial court to describe the weighing process is not a correct recitation of the law. R.C. 2929.03(D)(1) specifically states that the state has the burden of proving, beyond a reasonable doubt, that the aggravating circumstances sufficiently outweigh the mitigating factors. "*Absent such a finding*, the jury shall recommend that the offender be sentenced to life * * *." R.C. 2929.03(D)(2). The instruction given by the trial court is not only technically wrong, but by reversing the language of the statute, it fails to tell the jury what happens if the aggravating circumstances and mitigating factors are in equipoise.

{¶ 84} Nevertheless, it is well established that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten* (1973), 414 U.S. 141, 146-147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373; *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. In examining the entire jury charge, the following instructions were also given to the jury:

"The prosecution has the burden of proving beyond a reasonable doubt that the aggravated — aggravating circumstances outweigh any mitigating factors which may be present.

" * * *

"You as jurors must balance the evidence. The existence of mitigating factors does not foreclose the death sentence, if the aggravating circumstances that the offense was committed during an aggravated robbery outweigh the mitigating factors by proof beyond a reasonable doubt. If the aggravating circumstances outweigh the mitigating factors your sentence shall be death.

" * * *

"You shall recommend the sentence of death if all 12 jurors find beyond

proof—find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

"If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend either a life sentence with parole eligibility after serving 20 years of imprisonment or a life sentence with parole eligibility after serving 30 years of imprisonment."

{¶ 85} The verdict forms that were given to the jury correctly stated the weighing process. Further, there were no questions during the deliberations, and the jury came back with a verdict of death in just under two hours.

{¶ 86} When reviewing the jury instructions as a whole, it cannot be said that "but for the error, the outcome of the trial clearly would have been otherwise." *Underwood*, at syllabus. The twelfth proposition of law is overruled.

Failure to Weigh Mitigating Evidence

{¶ 87} Madrigal presented evidence during the penalty phase that he had adjusted well to the institutional setting of prison and that such evidence should weigh in favor of imposing a life sentence. The trial court, in reviewing this factor in its R.C. 2929.03(F) opinion, stated that "[i]nformation that Madrigal is capable of serving a long life term is not entitled to any weight." In his thirteenth proposition of law, Madrigal argues that the trial court erred in failing to assign weight to this factor.

{¶ 88} This court has previously recognized that the ability to adjust to prison life is a mitigating factor that can be assigned weight. *State v. Smith* (1997), 80 Ohio St.3d 89, 121-122, 684 N.E.2d 668, 696; *State v. Bradley* at 149, 538 N.E.2d at 385. However, the weight, if any, given to a mitigating factor is a matter for the discretion of the individual decision-maker. *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132; *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972, 988. The failure to give weight to this factor was not error; therefore, this proposition of law is overruled.

Ineffective Assistance of Counsel

{¶ 89} In his fourteenth proposition of law, Madrigal makes generalized and sweeping statements concerning the performance of his counsel, with little citation to specific examples or arguments as to prejudice from this alleged ineffectiveness.

{¶ 90} In order to prevail on a claim of ineffective assistance of counsel, Madrigal must show that counsel's performance fell below an objective standard of reasonableness and, in addition, prejudice arose from counsel's performance. See *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *State v. Bradley*, at paragraphs two and three of the syllabus.

{¶ 91} A review of the record fails to disclose any instances of conduct that would violate Madrigal's Sixth Amendment right to the effective assistance of counsel. Of the general instances mentioned by Madrigal—"wholesale abdication of the right to challenge evidence, rehabilitate jurors, object to improper and prejudicial jury instructions, and the like"—the merits of these issues have all been examined by this court and found not to rise to the level of reversible error. Thus, counsel did not fall below an objective standard of reasonableness and Madrigal did not suffer prejudice. This proposition of law is overruled.

Cumulative Error

{¶ 92} Madrigal argues in his fifteenth proposition of law that the cumulative effect of all the errors he has presented violated his right to a fair trial. Errors that are separately harmless may, when considered together, violate a person's right to a fair trial. *Walker v. Engle* (C.A.6, 1983), 703 F.2d 959, 963; *Martin v. Parker* (C.A.6, 1993), 11 F.3d 613, 615; *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus.

{¶ 93} However, in order even to consider whether "cumulative" error is present, we would first have to find that multiple errors were committed in this case. We find one trial phase error, the admission of the co-defendant's statement, but

determine that it was harmless beyond a reasonable doubt. This error is not the type of error that we have previously held can have a "carry-over" effect in the penalty phase. *State v. Thompson*, 33 Ohio St.3d at 15, 514 N.E.2d at 421.

{¶ 94} Further, although the trial court should have included the *Brooks* instruction in the penalty-phase instructions, the unanimity instruction given was not error. The misstatement concerning the weighing process in the twelfth proposition of law was waived and found not to rise to the level of plain error.

{¶ 95} After examining the issues presented by Madrigal, we cannot say that due process was not satisfied in this case. See *Walker v. Engle*, 703 F.2d at 962. There is no cumulative error present here; therefore, this proposition of law is overruled.

Settled Issues

Inquiry on Waiver of Right to Testify

{¶ 96} In his sixth proposition of law, Madrigal argues deprivation of due process rights because the trial court did not, *sua sponte*, inquire as to whether Madrigal "understood he had a right * * * to testify" and "determine whether he was voluntarily waiving that right."

{¶ 97} We recently addressed this issue in *State v. Bey*, 85 Ohio St.3d at 499, 709 N.E.2d at 497, and held that "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis *sic*.)

{¶ 98} In this case, nothing in the record suggests that Madrigal was unaware of his right to testify or that Madrigal's counsel failed to advise him of his right. Nothing suggests that Madrigal wanted to testify and was denied the opportunity to do so. This proposition of law is overruled.

Constitutionality of the Death Penalty

{¶ 99} In his seventh and eighth propositions of law, Madrigal argues that Ohio's capital sentencing scheme violates the United States Constitution and that

procedures that allow direct appeal to this court should be reexamined. We have previously examined and disposed of the same issues presented here. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285-286, 509 N.E.2d 383, 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633; *State v. Smith*, *supra*. These propositions of law are overruled.

Scope of Proportionality Review

{¶ 100} In his ninth proposition of law, Madrigal asks the court to revisit *State v. Steffen*, at the syllabus, concerning the universe of cases to be considered by an appellate court when conducting the proportionality review required by R.C. 2929.05(A). Madrigal presents no new arguments concerning this issue and, therefore, based upon *Steffen*, this proposition is overruled. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; syllabus.

Retroactivity of Amended Substitute Senate Bill No. 2

{¶ 101} R.C. 2929.03 was amended as part of Am.Sub.S.B. No. 2 (146 Ohio Laws, Part IV, 7136, 7454-7456) and Am.Sub.S.B. No. 269 (146 Ohio Laws, Part VI, 10752, 10926-10927) to allow a jury in a capital case to consider the sentencing alternative of life imprisonment without parole. The effective date of the amendments was July 1, 1996. Appellant committed the aggravated murder offense prior to the effective date of the amendments, but he was not sentenced until after July 1, 1996. Nevertheless, appellant contends that the trial court was required to instruct the jury, in the penalty phase, to consider the new sentencing alternative of life imprisonment without parole. However, the sentencing provisions of

Am.Sub.S.B. No. 2 apply only to those crimes committed on or after July 1, 1996. See *State v. Rush* (1998), 83 Ohio St.3d 53, 697 N.E.2d 634; *State v. Raglin* (1998), 83 Ohio St.3d 253, 259-260, 699 N.E.2d 482, 489. Therefore, contrary to appellant's arguments, the trial court did not err by refusing to instruct the jury to consider the sentencing alternative of life imprisonment without parole. This proposition of law is overruled.

Independent Sentence Review

Appropriateness and Proportionality

{¶ 102} In his sixteenth and seventeenth propositions of law, Madrigal argues that his death sentence is not appropriate and is disproportionate. His arguments will be considered in our independent sentence review.

{¶ 103} Madrigal was charged and convicted of aggravated murder during the course of an aggravated robbery. The state proved beyond a reasonable doubt that Madrigal entered the KFC with the intent to commit a robbery, stole money from the cash registers, and, in the course of the robbery, shot and killed Fisher. Moreover, the evidence establishes that Madrigal was the principal offender in the aggravated murder.

{¶ 104} The nature and circumstances of the crime offer nothing in mitigation for Madrigal. However, his history, character, and background suggest a number of mitigating factors. As in the majority of death penalty cases to come before this court, Madrigal's childhood was chaotic. Madrigal's mother was Hispanic and his father was African-American, which caused Madrigal to experience racial identity problems as he was growing up. Madrigal's mother abandoned him when he was nine years old, leaving him and his belongings (in garbage bags) on the porch of his grandmother's house. His father, James Burel, Sr., and Burel's wife, Christine Dunn, had been seeking custody of Madrigal because they had noticed bruises on him and suspected that he was being abused by his mother and her boyfriend. Burel and Dunn were both involved with drugs

for a period of time. After they obtained custody, Madrigal's mother would say that she was going to visit him, but then she would not show up.

**{¶ 105}** When Dunn and Burel divorced, Madrigal stayed with his father, who went on to marry Jodi Turner. Madrigal was thirteen at the time. Turner and Burel hosted many parties in their house and they would tell Madrigal not to come home and would lock him out of the house. At the time of Madrigal's trial, his father was incarcerated in the Sandusky County Jail on drug trafficking charges.

**{¶ 106}** Dr. Christopher Layne, a psychologist, examined Madrigal. Dr. Layne opined that Madrigal exhibited confusion and a very poor sense of identity, *i.e.*, "an ever-changing, almost kaleidoscopic inner world." He diagnosed Madrigal as antisocial with borderline traits, which is a personality disorder, not a mental illness. Layne agreed that Madrigal has a "me-first attitude," and "would rather take what doesn't belong to him as opposed to earning it for himself." There was some indication that Madrigal abused alcohol, although there was no evidence that he was drunk the night of the offense. His history, character, and background are entitled to some mitigating weight. *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 692 N.E.2d 151, 166; *State v. Goff*, 82 Ohio St.3d at 141, 694 N.E.2d at 930.

**{¶ 107}** Madrigal attended eight different schools, failed third grade, and had a borderline IQ (84). However, he was employed at times, as evidenced by pay stubs that were located among his belongings. This is entitled to some mitigating weight. *State v. Mitts*, 81 Ohio St.3d at 236, 690 N.E.2d at 533; *State v. Getsy* (1998), 84 Ohio St.3d 180, 207, 702 N.E.2d 866, 891.

**{¶ 108}** Madrigal was twenty-one at the time of the crime, a factor entitled to only slight mitigating weight. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227 (21 years old); *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419 (21 years old); *State v. Wilson* (1996), 74 Ohio St.3d 381, 659 N.E.2d 292 (21 years old); *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724 (21 years old).

{¶ 109} There was evidence that he conformed well to prison life, not causing any disciplinary problems during his incarceration prior to trial. This is entitled to some mitigating weight. *State v. Smith*, 80 Ohio St.3d at 121-122, 684 N.E.2d at 696; *State v. Goff*, 82 Ohio St.3d at 143, 694 N.E.2d at 931; *State v. Mason* (1998), 82 Ohio St.3d 144, 170, 694 N.E.2d 932, 957.

{¶ 110} Even considering the mitigating factors set forth above, the single aggravating circumstance, murder during the course of an aggravated robbery, outweighs, beyond a reasonable doubt, the factors in mitigation of a death sentence.

{¶ 111} One of the most recurring aggravating circumstances in capital cases is that the aggravated murder occurred during the course of an aggravated robbery. Madrigal asks this court to compare his case to *State v. Scott*, *supra*, 26 Ohio St.3d 92, 26 OBR 79, 497 N.E.2d 55, and *State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883, for proportionality review, arguing that his case is disproportionate to those cases.

{¶ 112} In *Scott*, the defendant shot a shop owner in the chest, killing her, during the attempted robbery of her store. The only mitigating evidence presented was residual doubt. In *Van Hook*, the defendant lured the victim from a bar to the victim's home, where he proceeded to savagely murder him with a knife and rob him. He presented mitigating evidence of a possible mental condition and drug and alcohol ingestion, as well as an unstable home life. In both cases the court affirmed the death sentence.

{¶ 113} This case is also factually similar to *State v. Sheppard* (1998), 84 Ohio St.3d 230, 703 N.E.2d 286, where the defendant shot a beverage store owner in the back of the head. Sheppard presented mitigating evidence that he was raised in a family that was struggling financially and that he had suffered a head injury in his teenage years that dramatically changed his behavior. He also had a family history of mental illness, he had been diagnosed as paranoid schizophrenic, he was eighteen at the time of the crime, and he lacked a criminal history. The court

32

affirmed his death sentence.

**{¶ 114}** While arguably Madrigal presents more mitigating evidence than *Scott*, and marginally more evidence than *Van Hook*, the mitigating evidence in *Sheppard* was far greater than what Madrigal presented. The death sentence in this case is not disproportionate to other death sentences in aggravated robbery cases presented to the court and the death sentence is not inappropriate. For these reasons, the judgment of the court of common pleas is hereby affirmed.

*Judgment affirmed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

LUNDBERG STRATTON, J., concurs in judgment only.

_____