JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal by Otis Price from his convictions, following a jury trial before Judge John Sutula, on one count of aggravated burglary, with a three-year firearm specification; two counts of aggravated robbery, both with three-year firearm specifications; and possession of a weapon while under a disability. Price claims he was erroneously denied a trial separate from his co-defendants, that the judge improperly permitted the testimony of a witness, that he was wrongfully denied the opportunity to impeach the credibility of one of the victims, and that these errors, cumulatively, were prejudicial to him and denied him a fair trial. We affirm.
 {¶ 2} From the record we glean the following: In June, 2000, Anthony Moon, his son, R.,[1] and his cousin, Clarence Ransom, were present at the Moon residence, in Cleveland.[2] Moon, a paraplegic, and Ransom were playing a video game in Moon's bedroom; R. was playing his own video game in his bedroom. The State claimed that at roughly 5:00 p.m., Price, Edward Morrow, Wynyanna Winchester and David Clark[3]
entered Moon's home, uninvited. While Clark acted as some sort of a look-out, Price and Morrow, armed with handguns, confronted Moon and Ransom in Moon's bedroom and held them at gunpoint. Then Morrow and Winchester, who was unarmed, found R., and Morrow put his gun to R.'s head and brought him into Moon's bedroom. R. and Ransom were ordered to lie flat on their stomachs, and Moon was ordered to remain on his bed and place his hands behind his head.
 {¶ 3} The State alleged that Price and Morrow stole several items from the bedroom, including Moon's car keys and cell phone, a handgun, Ransom's pager, and about $850 in cash lying on the bed. While Price and Morrow ransacked the rest of the home searching for money and/or drugs, Moon's wife, Tonya, came home and Moon immediately told her to lie on her stomach and avert her gaze so that she could not see Price and Morrow.
 {¶ 4} After Price and Morrow scoured the house, they and Winchester left through a rear/side window and went to Clark's home, two doors away. Ransom waited a short time and then ran to a neighbor's home and called 911; he then met Clarence Harris on the street and told him what had happened. Two Cleveland police officers arrived at the scene and, after learning that there were four suspects and firearms involved, they radioed for a supervisor and two additional officers as backup. Harris volunteered to the officers that a short time before, he had seen two men and a woman walking from Clark's house, toward Moon's and, shortly before the police arrived, he had seen them running back toward Clark's house.
 {¶ 5} While Moon and his wife were on their front porch, the police knocked and announced themselves at Clark's home. He opened the door and was immediately taken into custody after the Moons positively identified him. Clark's girlfriend gave the police consent to search his house, and Price was found hiding in an unfinished attic space. Near him, beneath floor boards, $850 in cash was discovered. Morrow and Winchester were found hiding in the basement where the police also discovered a handgun that was hidden in dirty laundry on the floor and a bag containing a second firearm, Moon's car keys, his cell phone and Ransom's pager. Moon's handgun was found in an unplugged freezer on the first floor of the house.
 {¶ 6} Price was indicted on one count of aggravated burglary and two counts of aggravated robbery, with Moon and Ransom as the named victims. Each of these charges carried one-year and three-year gun specifications. Price was also charged with possessing a weapon while under a disability. After Price, Morrow and Winchester went to trial, the jury found Price guilty of both counts of aggravated robbery and the aggravated burglary count, along with all firearm specifications,[4]
and the judge found him guilty of having a weapon under a disability. He was sentenced to three years in prison on each of the aggravated robbery and aggravated burglary counts, and to one year in prison on the having a weapon under a disability count, all to be served concurrently, but consecutively to the mandatory three-year prison sentence on the firearm specifications attached to each principal offense.[5]
 I. SEPARATE TRIAL {¶ 7} Price claims that he should have been tried separately from Morrow and Winchester because, during opening statement, Winchester's lawyer made some claims that were incriminating to him and incompatible with his defense that he did not possess a gun at any time, and merely went to Moon's home because Moon had sold him some bad drugs and he wanted his money back.
 {¶ 8} Crim.R. 8(B) provides:
 {¶ 9} "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count."
 {¶ 10} However, Crim.R. 14 provides:
 {¶ 11} "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. * * *."
 {¶ 12} The law favors the joinder of defendants and the avoidance of multiple trials.[6] "Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries."[7]
An appellate court will not disturb a judge's decision on joinder or severance absent a clear showing of abuse of discretion.
 {¶ 13} The appellant has the burden to show that the judge abused his discretion in denying severance.[8] If, however, a judge grants a mistrial for misjoinder of defendants after the jury is empaneled, such ruling must be justified by either manifest necessity or by the belief that the ends of public justice would otherwise be defeated.[9]
 {¶ 14} Where co-defendants present conflicting, antagonistic defenses, severance may be required. "Defenses are antagonistic where each defendant is trying to exculpate himself and inculpate his co-defendant. * * * Antagonistic defenses can prejudice co-defendants to such a degree that they are denied a fair trial."[10]
 {¶ 15} While Price argued below, and asserts here, that, in his opening statement, Winchester's attorney asserted that Price was carrying a gun as he entered the Moons' home, he is mistaken. The attorney said that the prosecution had alleged that Price used a firearm, and that Winchester would testify that she had no knowledge of any guns being present and, as far as she knew, no burglary or robbery took place. There was no conflict between Winchester's testimony or her lawyer's argument that she had done nothing wrong and Price's defense. She testified that she was merely a follower, high on drugs, when she entered the Moons' home, that Price and Morrow only argued with Moon about some bad drugs he had sold them, and after which the three exited through a window. Price similarly contended at trial that the incident with Moon was only an attempt to recover the money he paid for some unacceptable narcotics. He did not sufficiently demonstrate at trial that any co-defendant's antagonistic defenses prejudicially affected his right to a fair trial and, therefore, that the motion for severance should have been granted.
 {¶ 16} Even if that opening statement could be interpreted to conflict with Price's theory of the case, the lawyer is not a witness subject to cross-examination, and the judge repeatedly instructed the jury that contents of opening statements and closing arguments are not to be considered as evidence. We must presume that the jury obeyed the instructions and did not consider Winchester's lawyer's remarks in a manner resulting in prejudice to appellant.[11]
 {¶ 17} Price also contends that Winchester's testimony that they all left the Moons' home by climbing out of a rear window impermissibly, circumstantially proved him guilty of a crime because, under State v.Moritz,[12] a jury could infer wrongdoing from such a bizarre course of conduct. Moritz, however, is facially inapplicable because that case forbids the State from introducing an accomplice's out-of-court inculpatory statement about a defendant, where the accomplice is not subject to cross-examination by the defendant. Winchester testified, and Price was able to exercise his Sixth Amendment rights and "confront" her, so no violation of confrontation rights occurred.
 {¶ 18} The State presented the testimony of each victim of the aggravated robberies and aggravated burglary. Moreover, before Clark's home had been searched, Moon had told the police what had been taken, and all the items were subsequently found inside it. These facts, bolstered by corroborative testimony describing the robbers given to police at the scene, and in-court, re-affirming identifications of them, reinforced the overwhelming degree of proof presented by the State that Price and his associates did commit the crimes alleged. Any error, we assume purely for the sake of argument, must be seen as harmless. This assignment of error is not well taken.
 II. THE SURPRISE WITNESS {¶ 19} Price contends it was error to allow R. to testify that Morrow took him to his father's bedroom while holding a gun to R.'s head. The defense's objection was twofold: that the State had failed to name R. as a prospective witness, and that the assistant prosecutor, who interviewed the boy only one day before trial, had learned that he would testify that one of the robbers put a gun to his head. Because they claimed it was untimely disclosed, given its "inflammatory and prejudicial" nature, all the defense lawyers objected to this disclosure as a violation of Crim.R. 16.
 {¶ 20} Crim.R. 16 requires a party to provide, upon written request of the other party, the discovery allowed by the rule. When requested by the defendant, the rule requires the State to provide, inter alia, any documents which are available to or within the possession of the State and are material to the preparation of the defense or that the prosecutor intends to use as evidence at the trial, and a list of witnesses the State expects to call.[13] The enforcement provision of the rule states that "the court may order [the non-complying] party to permit discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."[14]
 {¶ 21} A judge has discretion to determine the proper response to a party's failure to fully comply with Crim.R. 16,[15] and is not required to exclude non-disclosed information at trial, although he has the option to do so. "Reversible error exists only where the exercise of such authority by the trial court constitutes an abuse of discretion."[16]
 {¶ 22} The Ohio Supreme Court has held that "a trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery."[17] Where the State violates Crim.R. 16 by failing to provide the name of a witness, a judge does not abuse his discretion in allowing the witness to testify where the record fails to disclose (1) a willful violation of the rule, (2) that foreknowledge would have benefitted the accused in the preparation of his or her defense, or (3) that the accused was unfairly prejudiced.[18]
 {¶ 23} The trial began on March 20, 2001, and, although the lawyers for Winchester and Morrow contended that R. never appeared on any witness list the State provided to them, the assistant prosecutor faxed Price's lawyer an amended witness list which included R.'s name on February 12, 2001. Any argument Price now presents must be predicated on the prejudice flowing from late disclosure of the contents of R.'s testimony. Price's argument at trial was that R.'s testimony was very "prejudicial" and that it was disclosed to the defense one day prior to his in-court testimony. He did not, however, establish why that testimony was unfairly prejudicial or what measures he would require to minimize or eliminate any prejudice from late production of this information; he simply sought to exclude it.
 {¶ 24} Merely negligent discovery production does not amount to, or equate with, willful discovery evasion.[19] Further, as here, where "* * * [a defendant] simply rests upon the fact that he did not know of [a witness] until the day before trial; [and] he has failed to proffer any argument indicating that additional foreknowledge of [the witness] and his intended testimony would have benefitted him or that he was unfairly prejudiced," there are insufficient grounds for reversal.[20]
 {¶ 25} It is clear that, while Price and his co-defendants' lawyers argued for exclusion of R.'s statement that Morrow held a gun to his head, it is also apparent that the testimony was not unfairly "prejudicial;" rather, it was simply very damaging to place a ten-year-old boy on the witness stand to testify that, as his father was being robbed, a defendant felt the need to press the barrel of a gun to the boy's temple. Unfavorable testimony is not immediately prejudicial so as to warrant automatic exclusion, and Price presented the judge with no legitimate reason to exclude any of R.'s testimony. This assignment of error is not well taken.
 III. IMPEACHING MOON'S TESTIMONY {¶ 26} Price asserts it was error to deny him the use of an affidavit, subsequent search warrant, and a property inventory listing items including guns, ammunition, crack cocaine, and $470 in cash, seized by the police from the Moons' home on February 5, 2001. Moon had testified under oath that he was not a drug dealer or user, and that the only gun in his home was his wife's pistol-the one that had been stolen and found in Clark's freezer. The defense lawyers, therefore, wanted to use the warrant, affidavit, and inventory to impeach his credibility, but the judge did not permit that line of questioning. He found the warrant, affidavit, and inventory constituted hearsay and was irrelevant to the issue of whether Moon and his family had been robbed at gunpoint in their home by the defendants.
 {¶ 27} Although a defendant has the right to cross-examine a witness, including the right to impeach a witness' credibility, the extent of cross-examination on an appropriate subject of inquiry is within the sound discretion of the judge.[21] Unless the ruling was unreasonable, arbitrary, or unconscionable, it must stand.[22]
 {¶ 28} Evid.R. 608(A) provides that the "credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but * * * the evidence may refer only to character for truthfulness or untruthfulness." The Ohio Supreme Court has held that "other than the Evid.R. 609 exception for certain criminal convictions, a witness' credibility may not be impeached by extrinsic proof of specific instances of his conduct. Such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B)."[23]
 {¶ 29} Evid.R. 608(B) provides that specific instances of a witness' conduct, "in the discretion of the [judge], if clearly probative of truthfulness or untruthfulness, [may] be inquired into on cross-examination of the witness * * * concerning the witness's character for truthfulness or untruthfulness." Where the judge allows such examination of specific instances on cross-examination, "if the answers received on cross-examination do not satisfy the examiner, it is said that the examiner is bound by or `stuck' with the responses."[24]
 {¶ 30} It is clear that extrinsic evidence, such as the warrant, its affidavit, and the inventory of items seized from Moon's house could not have been either used or placed into evidence by any defendant to impeach Moon's credibility. However, it is also clear that Price's lawyer attempted to ask Moon if a search warrant had been executed at his home on February 5, 2001, and if the items noted on the inventory sheet had been seized — all without referencing any supporting documents — and he should have been allowed to do so. In the event Moon had denied the allegations, however, he could not have followed up his question with reference to any extrinsic proof. It was an error to prevent Price's lawyer from asking that specific question.
 {¶ 31} To obtain a reversal based on erroneous evidentiary rulings, however, a defendant must show that the judge abused his discretion in the admission or exclusion of the evidence in question, and that the defendant has been materially prejudiced thereby.[25] While Price was not allowed to delve into the factual basis of a hypothetical search warrant or its fruits, all the defendants examined Moon extensively about whether he used or sold drugs, considering that he lived in an area of Cleveland where much drug activity is continually present.
 {¶ 32} This inquiry took place amidst the backdrop of a financial picture that disclosed Moon's income was $512 per month in Social Security, that Mrs. Moon earned ten dollars per hour but had not worked for three months after the robbery, and that Moon owned a Lexus automobile, adequately provided for himself and his family and paid his bills. The jury was well aware of the defense theory, forcefully put forth during the opening and closing statements of each defendant's lawyer, that Morrow, Price and Winchester went to Moon's home to dispute the quality of drugs they had purchased, a heated argument ensued and the three rapidly fled, taking Moon's guns with them for protection.
 {¶ 33} In addition, as we found in addressing Price's first assignment of error, the State presented overwhelming proof of his guilt. While it was error to prohibit questioning Moon about the facts underlying the execution of the search warrant and the guns, drugs, and money found upon the execution of the warrant, the error was harmless.
 IV. CUMULATIVE ERROR {¶ 34} Price submits that the judge's failure to: (1) sever his trial; (2) forbid R.'s testimony; and, (3) permit appropriate questions, though each not enough to compel reversal, collectively operated to deny him a fair trial. This concept is known as the "cumulative error doctrine."[26] For this doctrine to apply, however, we must find multiple errors present in the trial of this matter,[27] and the only one we found was harmless. This assignment of error is not well taken.
Judgment affirmed.
COLLEEN CONWAY COONEY, J., and ANTHONY O. CALABRESE, JR., J., concur.
[1] R. was nine years old at the time of the events in question and ten years old at the time of trial. Under this court's policy of naming juveniles by their initials only, in order to preserve their anonymity, we do so here.
[2] The home is actually a double residence; the Moon family lived in the first floor unit.
[3] At the time of trial, Clark was a fugitive with an outstanding warrant because of the events in question.
[4] Morrow was similarly convicted, and Winchester was convicted of two counts of aggravated robbery and one count of aggravated burglary as an aider or abettor. These convictions were upheld on appeal. See State v.Morrow, Cuyahoga App. No. 79738, 2002-Ohio-5320, and State v.Winchester, Cuyahoga App. No. 79739, 2002-Ohio-2130, respectively.
[5] Price was advised that five years of post-release control was part of his sentence, and informed of the penalties should he violate supervision or control. The judge also informed him that violation of post-release controls could result in an independent charge of escape.
[6] State v. Thomas (1980), 61 Ohio St.2d 223, 225.
[7] Id.
[8] Torres, supra.
[9] See State v. Glover (1988), 35 Ohio St.3d 18, 19.
[10] State v. Daniels (1993), 92 Ohio App.3d 473, 486, (internal citations omitted).
[11] State v. Ferguson (1983), 5 Ohio St.3d 160, 163.
[12] (1980), 63 Ohio St.2d 150.
[13] Crim.R. 16(B)(1).
[14] Crim.R. 16(E)(3).
[15] State v. Wiles (1991), 59 Ohio St.3d 71, 78.
[16] Id.
[17] Lakewood v. Papadelis (1987), 32 Ohio St.3d 1, syllabus, par. 2;See, also, State v. Edwards (1993), 86 Ohio App.3d 550, 555.
[18] State v. Scudder, 71 Ohio St.3d 263, 269, 1994-Ohio-298.
[19] State v. Scudder, supra.
[20] State v. Brown, Cuyahoga App. No. 80412, 2002-Ohio-4577.
[21] State v. Green (1993), 66 Ohio St.3d 141, 147, certiorari denied (1993), 510 U.S. 891.
[22] See State v. Reed (1996), 110 Ohio App.3d 749, 753-754, State v.Adams (1980), 62 Ohio St.2d 151, 157-158.
[23] State v. Boggs (1992), 63 Ohio St.3d 418, 422, quoting State v.Kamel (1984), 12 Ohio St.3d 306, paragraph two of the syllabus.
[24] State v. Leuin (1984), 11 Ohio St.3d 172, 174.
[25] See, e.g., State v. Martin (1985), 19 Ohio St.3d 122, 129.
[26] See State v. Madrigal (2000), 87 Ohio St.3d 378, 397-398.
[27] Id. at 398.