OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Jamal Houston, filed May 15, 2008. On June 14, 2007, Houston was indicted on one count of murder, a felony of the second degree, in violation of R.C. 2903.02(B), with a firearm specification. On June 19, 2007, Houston pled not guilty. On August 10, 2007, Houston filed a "Motion to Suppress *Page 2 
Identification of Defendant," which the trial court overruled on September 25, 2007, following an evidentiary hearing. Following a jury trial on October 29 — November 5, 2007, the trial court entered an "Entry and Order Declaring a Mistrial," noting that "after a reasonable time for deliberation, the jury informed the Court that it could not reach a verdict."
 {¶ 2} Following retrial on April 21 — 25, 2008, Houston was found guilty of the charge of murder, with a firearm specification, and he was sentenced to fifteen years to life for murder and to an additional term of three years on the firearm specification, to be served consecutively.
 {¶ 3} At Houston's second trial, Dr. Kent Harshbarger, a forensic pathologist from the Montgomery County Coroner's Office, testified regarding the fatal injury sustained by the victim herein, nineteen year old Joshua Bland. Houston shot Bland on May 16, 2007, and according to Harshbarger, a single bullet entered the back of Bland's skull on the right side and exited through his right lower eyelid. Harshbarger testified, "the pathway is back to front, somewhat right to left, and roughly horizontal from the entrance wound out the right eye. The skull then fractures linearly to dissipate that pressure and is an irregular fracture." Harshbarger indicated that Bland's chance of survival from his injury was "quite small," and that "he would have been unconscious, would have collapsed right there." Bland died on May 22, 2007. Harshbarger testified, Bland's "wounds are defined as distant range gunshot wounds of indeterminate range."
 {¶ 4} Over Houston's objection, the trial court allowed testimony regarding a drug-related incident that occurred on May 12, 2007, the "Trotwood incident," during which Houston was not present, but which the trial court determined tended to show Houston's motive for the murder of Bland. Larry Rodgers testified first regarding the "Trotwood incident." Rodgers *Page 3 
testified that he and Houston have been friends for 10 or 11 years. Rodgers stated that he, Steven Jones, Bland, David Barnes and Barnes' toddler son were in Rodgers' mother's white Toyota Echo in Trotwood on the date of the incident, parked outside the Albright Apartments, "getting ready to smoke" some marijuana. Jones was in the driver's seat, Rodgers was in the front passenger seat, Bland was behind Jones, and Barnes was behind Rodgers. Barnes' son was between Bland and Barnes in the back seat. Rodgers testified that a police officer approached the car and asked the men to exit the vehicle. Before they got out, Barnes indicated to the men that "he wanted to put the dope in his baby's diaper so that * * * he wouldn't get patted down and caught with it." When the men exited the vehicle, "a marijuana bag fell out of the baby's diaper," and the officer issued Barnes a citation. Jones was then arrested on a warrant, Rodgers drove home, and Bland caught a bus home.
 {¶ 5} According to Rodgers, on the date of Bland's murder, he was with Jones in his mother's car when Jones received a cell phone call from Houston regarding the "Trotwood incident." Rodgers stated that he and Jones then went to Barnes' apartment, and that Jones and Barnes argued about "the crack coming up missing." According to Rodgers, "there was some threats made towards [Barnes]" by Jones. Rodgers testified that Jones said to Barnes, "If you don't give me the money for the dope that you stole from me, there's going to be some problems." Barnes did not give Jones any money or drugs.
 {¶ 6} Rodgers testified that he and Jones then left Barnes' apartment, and they drove to Bland's girlfriend's house to see Bland. Rodgers further testified that before they reached Bland, Jones spoke to Houston, and Houston told Jones "he was really pissed off that — that the money he had fronted [Jones] for — to buy the dope [Jones] can't pay him back for it. So, *Page 4 
he was just really pissed off and really disappointed that he couldn't pay him back for it." Rodgers and Jones then picked up Bland and took him to see Houston. Houston lived at the Salem Manor Apartments. The complex consists of two twenty-unit buildings, 2908 and 2912 Prescott Avenue. Houston lived in apartment 104 of 2912 Prescott. An alleyway or driveway runs between the buildings to a rear parking area. Rodgers testified that he and Jones told Houston, "The honest truth was that [Barnes] had put the crack in the baby's diaper and got away with — without being caught by that police * * * [who] took us out of our car that day. And, he just got caught with a bag of weed and got written a weed ticket. And nothing else happened."
 {¶ 7} Rodgers further testified that he, Jones and Bland entered Houston's apartment building, and then they returned to the front porch area and smoked a "blunt." Rodgers testified that they all intended to return to Barnes' apartment "to go get the money that * * * [Barnes] owed [Houston]." According to Rodgers, after a while he returned to his mother's car and sat in the passenger seat while Houston, Bland and Jones remained on the porch. Rodgers testified that while sitting in the car, he heard shots fired and he saw the men on the porch running away. Rodgers leaned over inside his vehicle, and he testified on direct examination that he did not see who fired the gun. Rodgers testified that he then saw a car pull up behind him and then pull away. Rodgers moved over to the driver's side of his mother's car and drove away, returning to the scene when the police arrived.
 {¶ 8} According to Rodgers, upon his return, he was placed in a cruiser and taken to the police station downtown, where he spoke to Detective Michael Galbraith. Rodgers testified, "that day I changed my story about two or three times." Rodgers stated that he initially told *Page 5 
Galbraith that he heard shots fired, observed the men fleeing from the porch, and that he ducked down in the car and did not see the shooter. Later, Rodgers testified that he told Galbraith, "that I saw somebody with a scarf on their face shooting at the Defendant, Josh and Steven. That's why I took off running." According to Rodgers, his second story was false. Rodgers testified that he only made an oral statement.
 {¶ 9} After talking to Galbraith downtown, Rodgers testified that he met with Galbraith "two or three times" in Centerville, along with Galbraith's partner. According to Rodgers, "On every occasion I changed my story until he let me go home." Rodgers testified that he signed a written statement drafted by Galbraith, but that he "never read what they wrote down because how long it was." Rodgers denied telling Galbraith that he observed a struggle between Houston and Bland on the porch, during which Bland grabbed Houston's hand, and Rodgers testified that he only observed Houston hand Bland a beer.
 {¶ 10} Rodgers testified that he told Galbraith during the Centerville interview that Bland told Houston and Jones that he did not take the missing crack. Rodgers denied that he told Galbraith that the exchange between Bland and Houston was heated. Rodgers denied telling Galbraith that Houston must have fired the shots, striking Bland, after the men struggled on the porch. Rodgers also denied telling Galbraith that Houston blamed Bland for the missing drugs, and he asserted, "there was an argument over at [Barnes'] house with [Jones] and [Barnes]. There wasn't no argument over at [Houston's]." Rodgers admitted that he told Galbraith that he did not see anyone in the area of the shooting besides Houston, Bland and Jones. According to Rodgers, when he returned to the scene, Houston was in the back of a police cruiser, and Rodgers was also in the same cruiser. *Page 6 
 {¶ 11} On cross-examination by Houston, Rodgers indicated that he made a statement in the police cruiser regarding what he had seen, a second statement downtown on the evening of the shooting, a third statement on May 31, 2007, in Centerville, and a fourth statement on June 4, 2007, in Centerville. Rodgers also indicated he made a videotaped statement to Houston's private investigator. Rodgers testified that he felt pressured during the police interrogations but not when he was questioned by Houston's private investigator. Rodgers testified that the police asked him to say that Houston shot Bland "because they couldn't figure out who * * * it was." Rodgers stated that he had observed a .38 caliber weapon inside Houston's apartment. Rodgers testified that there was no connection between Houston and Bland, and that the men met for the first time at Houston's apartment the night of the shooting. According to Rodgers, "I didn't see nobody with a woolen scarf on. That was Jamal's statement. I didn't see nobody with a scarf on. * * * I didn't have the chance to look over to the side where the shots were coming from. They were coming from the side of my car and they hit the * * * building." Rodgers testified, when he sat back up in the car after the shots were fired, the men on the porch "had already made it around the corner. They were already gone." Rodgers testified that he did not see Bland's body until a car pulled into the area near the body and illuminated it, and then turned around.
 {¶ 12} David Barnes testified next, and he stated that on May 12, 2007, he, his son, Rodgers, Jones and Bland drove to the Albright Apartments, where Barnes intended to visit his cousin. Jones drove Rodgers' mother's car. When the men arrived at the apartments, Barnes testified that his cousin was not at home, so they "started smoking a blunt" while they waited for the cousin to return, and a police officer on foot patrol approached the vehicle. Upon seeing the *Page 7 
officer, Jones "threw some weed in the back to [Bland], like on the side of the back." Then, Barnes testified, Bland handed the weed to Barnes, and Barnes testified, "I put it in my baby diaper and sent him over to my cousin house."
 {¶ 13} Barnes testified that three or four days after the incident, Rodgers and Jones came to his home in the same vehicle. Jones "was talking about somebody needed to cash him out for some dope." According to Barnes, Jones wanted Barnes to pay him for some crack that Jones accused Barnes of putting in his baby's diaper, and that was missing after the incident. Barnes testified, "he was just basically saying if the money don't come up, if I don't pay him for it or I guess if Josh didn't pay him * * * something was going to happen. He said gunplay." Barnes stated that he perceived Jones' words as a threat. Barnes stated that he did not give Jones any money or any drugs, and the two mean left Barnes' home. Barnes testified that he put only marijuana in his son's diaper. According to Barnes, after Bland was killed, he heard nothing else about the missing drugs.
 {¶ 14} Kassandra Matlock next testified for the State. Matlock and her husband reside at 2908 Prescott Avenue, on the second floor. According to Matlock, she returned home on the evening of the shooting, and in the course of parking her car, her headlights illuminated Bland's body. Matlock went to help Bland, but when her husband yelled to her that the shooting had just occurred, she ran into her apartment and called the police. Matlock stated that she did not observe anyone outside the apartment buildings or any cars coming and going from the complex. Matlock testified, "I don't know if it was the day of or before or right after the incident, but there was a white car that wasn't normally in there." The car was "in front of, next to 2912." *Page 8 
 {¶ 15} Marvin Edmonds also testified for the State. Edmonds lives at 2912 Prescott Avenue, in apartment 101. He is disabled, suffering from retinitis pigmentosa. At the time of the shooting, Edmonds was at home, awaiting the arrival of a friend. Edmonds testified that the apartment manager's office is right across the hall from his downstairs apartment. Edmonds stated that he thought he heard his doorbell ring, and he got up to answer it. Edmonds went into the hallway, where he looked up the stairs and observed "a black brother" leaning against the wall by the front door of the building. Edmonds asked the man if someone had rung his doorbell and was told no, "just real nasty like." Edmonds then walked up a couple of steps, where he observed a "white brother sitting on the step." Edmonds turned to return to his apartment, and "as soon as I stuck a key in and I noticed somebody was behind me and — and then I got ready to go in and I noticed my neighbors right across from me were carrying some kind of weapon." According to Edmonds, Houston's apartment is next to the manager's office, diagonally across from Edmonds' apartment on the lower level. Edmonds stated, "All I seen of the weapon was it was dark and I seen a magazine where they keep the * * * bullets in. And, I didn't see the whole gun." Edmonds testified that Houston covered the gun with a jacket. He stated that he knew the gun was an automatic weapon.
 {¶ 16} Edmonds returned to his apartment, and in "no more than a minute or two there was rapid gunfire." Edmonds said he heard five or six shots. After the gunfire stopped, Edmonds opened his door and observed Paula Moore, Houston's girlfriend, in the hallway, and she "looked at me like she wanted to get out there to stop him from doing what he was * * * doing." When Moore observed Edmonds, she ran back into Houston's apartment and slammed the door. *Page 9 
 {¶ 17} Edmonds then walked to the base of the stairs, and he looked up and observed the man that had been leaning against the wall and Houston running across the front porch of the apartment. When Edmonds heard the police arrive, he thought it was safe to go outside, and he left the building, along with other tenants who had come out of their apartments. Edmonds testified that the police were "holding everybody back," so he returned to his apartment. Edmonds stated that he did not speak to the police that night because he was scared, but on May 30, 2007, he told Galbraith what he had observed. On cross-examination, Edmonds testified that he is a convicted felon. He stated that he did not remember telling a policewoman at the scene that he did not want to make a statement because "I didn't see nothing."
 {¶ 18} Cecelia Streck, who worked at the Salem Manor apartment complex at the time of the shooting, also testified. Streck's responsibilities included answering the phone, taking messages, and cleaning empty apartments. According to Streck, she reported to work on May 17, 2007, and the manager informed her about the shooting that occurred the night before, telling her to be careful. On May 21, 2007, Streck again appeared for work, and she was instructed to clean apartment 208, at 2912 Prescott Avenue, which was vacant. Streck entered the apartment at approximately 10:30 a.m., she opened the living room window because the apartment was "stuffy," and she placed a cordless phone "in the window so I could hear it." Streck then began to clean the apartment.
 {¶ 19} When Streck's cordless phone rang, she walked to the window to answer it, but the phone stopped ringing before she answered the call. The alleyway or driveway between the two apartment buildings is visible from the living room window where Streck stood. While at the window, through a screen, Streck observed "a brown car pulling up" in the driveway. A *Page 10 
male and female were in the car, according to Streck, and the male was driving. Streck testified that she could tell the passenger was female because "she reached in the window and got her sunglasses and she had long fingernails." Streck also observed Houston outside the building, and she testified that she recognized him as the tenant who lived next door to the office. According to Streck, Houston was "talking real loud" to the people in the car, and "[h]e just stated that he had his stuff on the car and the white dude wouldn't leave his shit alone. That's why he got shot and that's why I shot him." Streck described Houston's tone as "harsh," and she stated that he was "pacing up and down," and "he had his arms up in the air." Streck reported what she overheard to the apartment manager, and he advised her to leave. Streck was later contacted by Galbraith, and she told the detective what she had observed and overheard. Streck identified Houston from a photo display, and she stated that she circled his picture and provided her signature.
 {¶ 20} On cross-examination, Streck was shown a photograph of the side of the apartment building, and she pointed to the apartment window where she stood and to the area where she overheard Houston's admission. Streck testified that the window through which she observed Houston is recessed, and also that it is elevated. She stated Houston was "about down to the left" from where she stood in the window, and that nothing blocked her view and she "could see perfectly." Counsel for Houston then asked Streck if she is an "older person," and "Caucasian," and he asked Streck, "you want this jury to understand and believe that you could understand clearly these young people talking animatedly and perhaps what might be street talk?" Streck responded, "I know what I heard, I'm not illit [sic] and I'm not hard of hearing and I know what I heard." *Page 11 
 {¶ 21} The next witness to testify for the State was Ruth Hensley, who resides in apartment 207, at 2912 Prescott Avenue. Hensley's apartment is on the second floor on the west side of the building. Hensley testified, on the night of the shooting, she was in her bedroom, watching t.v., at 10:00 p.m. She heard two voices arguing outside towards the front of the building, and then she heard gunshots. Hensley was scared, and she "ducked." She heard "quite a few" gunshots, and she testified that the first gunshot was louder than the last, and that the subsequent gunshots trailed off in the direction of the east side of the building. After the shots stopped, Hensley proceeded to the living room, where she observed lights from a police car. Hensley went downstairs and looked out the front door, and she testified that the police officers would not let her out of the building. Hensley spoke to the police and told them what she had heard.
 {¶ 22} After Hensley testified, the jury heard the testimony of Officers Roy McGill, Michael Saylors, Andrew Zecchini, and Michael Godsey. McGill is employed by the Trotwood Police Department, and he was the officer on foot patrol in the Albright Apartment Complex when "the Trotwood incident" occurred. He confirmed that Jones, Rodgers, Bland, Barnes and Barnes' baby were in the vehicle he approached, and that marijuana was recovered from the rear floorboard where Barnes was seated.
 {¶ 23} Saylors, a Dayton Police Department patrolman, testified that he and his partner responded to 2912 Prescott on May 16, 2007, on a "priority one shooting," and that they were the first on the scene. Saylors testified that he utilized his lights and siren as he approached the area. When asked if other officers also responded with their lights and sirens on, Saylors stated, "I can't say for everybody. I know I did. Generally what happens in that instance whenever you *Page 12 
arrive on scene first, there's great care in telling other officers to stop their tones if it's unnecessary for them to risk their lives through traffic. So, at that time when we arrived first, called for medic, called for a sergeant, I'm pretty sure I told people to cut their sirens, too, if that was the case."
 {¶ 24} Saylors stated that an individual standing in between the two apartment buildings flagged down his cruiser and pointed to the victim. Saylors testified that Bland's body was halfway between the front and back of the buildings on the east side of 2912 Prescott. According to Saylors, Bland "was breathing, but a very hard breathing." Saylors did not observe any other vehicles come or go once he arrived. Saylors observed "an open bottle of beer and casings along with blood, a heavy pool of blood." Saylors stated that the bottle of beer was "on the front stoop leading into the apartment complex." The casings were on "the sidewalk leading from the front of the apartment complex and around toward [where] the body was." According to Saylors, "from the pattern of the bullets, the way it looked, it looked like it was from the front of the apartment complex rounding the side." Saylors testified that the casings indicated that the weapon used was a semi-automatic weapon and not a revolver.
 {¶ 25} Officer Zecchini then testified that he and his partner were also dispatched to 2912 Prescott Avenue on the night of the shooting, and that they positioned their cruiser on Prescott Avenue to block traffic, since other crews were already at the scene. Zecchini testified that he did not utilize his lights and siren in responding. According to Zecchini, "there was already crews on the scene at the shooting, so we shut those off on Salem." Upon taking their position, Zecchini, from a distance of ten feet, maybe a little more," observed "an individual standing over kind of slumped over with his hands on his knees. * * * Kind of like he was out of *Page 13 
breath, like you would if you're doing sprints or running * * * ." Zecchini could not see his face because the individual "was looking down at the ground." According to Zecchini, the individual did not see Zecchini arrive since "he never made eye contact with me, so it was impossible for him to see me." Zecchini identified the individual as Houston. Zecchini testified that Houston was wearing "black sweats and like a black shirt," and he "had some mud on him." Zecchini obtained some information from Houston and put him in the back of his cruiser. Zecchini also observed Larry Rodgers in the area, and he placed Rodgers in his cruiser with Houston. Zecchini testified that the men were in the rear of his cruiser for about 40 minutes, and that they "definitely" could have communicated with each other during that time. Zecchini later took the men to the station.
 {¶ 26} Officer Godsey, an evidence technician for the Dayton Police Department, testified that he also responded to the scene of the shooting. Godsey took photographs of the scene, and then he searched the scene for evidence. Officers already at the scene directed Godsey's attention "to a couple shell casings on the sidewalk in front of the building, and * * * a couple on the pavement driveway or parking area," and to the victim. Godsey placed placards where all of the evidence was found. He then took a second set of pictures which included the placards. In his search, Godsey found a total of six spent casings on the sidewalk in front of the building and in the driveway area between the buildings. Godsey testified that he initially found five casings, and that during a subsequent search he found the sixth casing in a grassy area. In the course of his search, Godsey testified, "basically you're with a flashlight and you're walking around bent over looking, carefully looking for whatever * * * you think that * * * might be of evidentiary value." Godsey described the areas that he searched in detail. He stated that there *Page 14 
"was some artificial lights. There's a little light pole stuck in the front yard, and then there was some along the eves of the building." While he indicated that his evidence truck has a generator and "scene lights" to light up poorly lit areas, Godsey did not use his "scene lights" to illuminate his search. Godsey testified that when a semi-automatic weapon is fired, the casing is ejected "in most typical cases out the right side * * * of the gun."
 {¶ 27} Finally, Timothy Duerr, a forensic scientist with the Miami Valley Regional Crime Laboratory, testified that the casings retrieved from the scene were .9 millimeter cartridge cases, that they were all fired from the same gun, and "[t]ypically, .9 millimeter cartridge casings are fired from a semi-automatic firearm." Duerr testified that the shooter would have been in the area where the casings were found. On cross-examination, Duerr testified that he had examined other casings, from a May 9, 2007, felonious assault that occurred at 2961 Salem Avenue, and that some of those casings matched the casings found herein. According to Duerr, "they were fired with the same gun as these casings."
 {¶ 28} Virginia D'Elia testified for the defense. D'Elia resides at 2058 Parkhill Drive, and the Salem Manor Apartments are at the rear of her house. She testified that she was chilly the night of the shooting, and as she closed her back window, she observed a figure, wearing a dark colored hoodie, standing on the front porch of 2912 Prescott Avenue. According to D'Elia, she did not have a full view of that porch area from her home, but she could see "the doorway and the awning. I can see the area above my fence." D'Elia was unable to see the face of the individual on the porch. When she reached up to close the window, she heard "a lot of shots." D'Elia ducked down for a few seconds, and when she stood back up, she observed a figure that she "assumed * * * was the same person" standing still in her neighbor's side yard. The figure *Page 15 
then moved away down Prescott in the direction of Parkhill Drive, and D'Elia lost sight of the individual. She stated that she did not know if the shots she heard came from the figure she saw on the porch.
 {¶ 29} Alexis Brookshire, also a defense witness, testified that he had been friends with Houston for over ten years. After Brookshire learned of the shooting incident, he and a friend, Saloum Sylla, proceeded to 2912 Prescott Avenue on May 21, 2007, in the morning. Houston was not home, but as Broookshire was driving out of the complex, he observed Houston driving into the complex with his girlfriend, Paula Moore, and their child. According to Brookshire, Houston parked in front of his apartment window, and Brookshire parked his black, two-door Cavalier behind Houston, "right in the front." Brookshire indicated where he parked on a photograph of 2912 Prescott. After helping his girlfriend and child inside, Houston approached Brookshire's vehicle. According to Brookshire, "The whole time [Houston] said nothing about him doing any shooting. It was just him getting shot at." Brookshire claimed that Houston had not made the admission that Streck attributed to him about shooting the "white dude."
 {¶ 30} Saloum Sylla also testified for the defense. According to Sylla, Brookshire parked "right in front of — in front of the door." Sylla indicated on a photograph of 2912 Prescott where Brookshire parked his car. Like Brookshire, Sylla denied that Houston said anything about shooting a "white dude," stating, "nothing like that was being said when he was talking." Sylla testified that he and Houston are very good friends, and that he and Brookshire wanted to make sure that Houston was alright after the shooting. Sylla testified that there was not a woman in Brookshire's vehicle.
 {¶ 31} David Tate, who resided at 2230 Stanhope Avenue, apartment A, testified that on *Page 16 
May 9, 2007, he left his home and "went to the liquor store to purchase some beer, and I noticed a guy was on the retaining wall. He had on dark hooded gear. I didn't see his face. So, when I came out of the liquor store, that individual was still there. * * * I would say within 15 to 20 minutes I heard numerous gunshots. So when I went to my back window and that individual that was standing there he ran up the alley." Tate testified that the man he observed on May 9th was about "five six to five eight, about 160," and that Houston is significantly taller and heavier.
 {¶ 32} Samuel Johnson, Jr. next testified for Houston. Johnson lives in apartment 204, at 2912 Prescott Avenue. He testified that he arrived home "pretty close to 10:00" on the evening of the incident. At the time, he observed five people standing on the front stoop of the building, four of whom were black, and one of whom was white. According to Johnson, "there was one of them that had just went and got into a white vehicle or something over there." Johnson testified that he walked through the men to enter the building, and that he did not hear any argument or loud voices. Johnson observed Houston talking on his cell phone.
 {¶ 33} Approximately five minutes after Johnson entered his apartment, he heard gunshots, and he ducked down. After the shots stopped, he looked out his bedroom window, first to the north in the direction of the front stoop, where he saw no one, and then to the south, where he observed Bland, whom he had just seen on the front porch, on the ground on the east side of the building, and no one else. Johnson called 911, and then he left his apartment, observing Moore standing by the front door. Moore followed Johnson outside, and they looked at Bland. Moore than ran back into the building. The police arrived and Johnson was placed in a cruiser. *Page 17 
 {¶ 34} Robin Ross next testified for Houston. Ross lives at 2222 Stanhope Avenue, and she testified that, on May 9, 2007, she was sitting outside her apartment building after 10:00 p.m. According to Ross, "When I was sitting out there I seen a man pull out a gun and * * * by the time I * * * ran back into my apartment I heard shots." Ross stated that the man was standing on top of a retaining wall. Ross did not see the man's face, but she testified that he had "a medium build, had the thick corn rows going in the back." She stated he "had the handkerchief, loose fitting pants, loose fitting jersey * * * ." Ross estimated the man was about five six, and she indicated that the man she observed with the gun was shorter than Houston. She indicted on cross-examination that she and Tate had been together drinking earlier in the day on May 9th.
 {¶ 35} Paula Moore next testified for Houston. Moore stated that Jones, Rodgers and Bland came over to visit Houston between nine and ten o'clock on the night of the shooting. When the men rang the buzzer, Moore testified that Houston, "went out, let them in, they stood up top. He ran inside to get his keys, his beer and his blunt, and then he went back outside with them, all the way outside." Moore stated Houston was wearing a black Cincinnati Bearcat jersey and baggie black jogging pants. She stated that Houston did not wear a jacket, and that he did not keep a gun in their apartment. Moore did not see Houston again until he was returned to the apartment by the police. At that time, she stated he was muddy and "just upset and terrified."
 {¶ 36} After the incident, Moore stated that she and Houston stayed at Houston's mother's home for a few days. On May 21, 2007, they were back at 2912 Prescott Avenue, and Moore stated that Brookshire and Sylla came to visit Houston. Moore testified that after she and *Page 18 
Houston arrived at the complex, she took their baby inside, and Houston talked to Brookshire and Sylla for 15-20 minutes before returning to the apartment. Moore testified that Houston kept a .38 revolver in their apartment after the shooting that he got from his father. Moore stated that Rodgers and Jones were friends of Houston's and had been to the apartment before, but that Bland had never been there before the night of the shooting. She stated that when she left the building after the shooting, she observed Rodgers' car in the parking lot, and that she observed him back up and drive away.
 {¶ 37} Steven Jones testified next for Houston. Jones stated that he was involved in the "Trotwood incident," and that he was arrested that day, May 12, 2007. Jones stated that Houston was in no way involved, and Jones denied that Houston had given him money to purchase drugs. Jones further testified that Houston did not bear any animosity towards the people involved in the "Trotwood incident."
 {¶ 38} Jones testified that on May 16, 2007, Houston responded to the buzzer at his apartment, and that he, Rodgers and Bland stepped into the building for about ten minutes but did not enter Houston's apartment, while Houston returned to his apartment to get his beer, a "blunt" and his keys. Jones did not observe anyone else in the building. Jones testified that Houston was wearing sweat pants and a "jersey type shirt," and that he did not have a jacket. Jones stated that the men passed the "blunt" around, and that Houston sipped on his beer. Jones denied that there was any discussion about the "Trotwood incident" or missing drugs. Jones stated that Rodgers left the porch and got into his car after approximately 30 minutes. Jones stated that he observed a man pull into the parking lot and enter the apartment building while they were on the porch. *Page 19 
 {¶ 39} Jones further testified that he observed "the shooter" approach the apartments from the direction of Parkhill Avenue. According to Jones, "when I first seen him it wasn't like he was coming towards us. It was like he was going to cut through * * * ." Jones stated that he was paying attention to "the shooter" while the men on the porch continued to talk because of "my surroundings." Jones observed that the man was wearing "either a hooded jacket or a hooded sweatshirt and some dark colored shorts." According to Jones, the man "made a sudden stop, but as we was still talking I'm looking at him but I'm not looking at him. I'm not paying attention to him, but I am. So, we still talking and he start walking towards us and he said don't — he said don't move one time * * * ." The man continued to walk toward the group on the porch, and according to Jones, "then he said don't move for a second time, and that's when he shot." When Jones heard gunfire, he testified that he "just took off running," along with Houston and Bland. Jones stated that he "ran to the left in the back of the building, it's like a alleyway or a pathway that leads to the left by the second building * * * And Jamal went straight like through some woods." Jones stated there were six shots fired. Jones stated that he did not see Bland, who was behind him. Jones ran to "somebody's house" and told the woman there to call 911. A police officer picked Jones up and brought him back to the building, and he was later taken to the police station and interrogated.
 {¶ 40} On cross-examination, Jones admitted that he is a convicted felon. He stated that he has known Rodgers and Houston for ten years, and that they are his good friends. Jones testified that on May 16, 2007, he and Rodgers went to Barnes' apartment, along with Bland. Jones testified that he spoke to Houston at least once after the "Trotwood incident" and before Bland's murder. Jones stated that he did not get into an argument with Barnes. He stated that *Page 20 
he and Rodgers had been to Houston's apartment before, but that Bland had not.
 {¶ 41} Finally, Houston testified on his own behalf. Houston denied having any connection to the "Trotwood incident," and he denied giving Jones or any one else money to purchase drugs. Houston testified that he did not know Barnes or Bland. According to Houston, Rodgers, Jones and Bland came to his apartment at approximately 10:00 p.m. on the night of the shooting. Houston let them into the building after hearing his buzzer, and then he returned to his apartment to get his beer, keys and to roll a "blunt." According to Houston, "I come out to lock my door of my apartment. I take my bottle of beer and I put it under my arm like this to hold the blunt and the beer under my arm like this. And, I locked my door and I proceeded to go up out with the guys." Houston stated that he was wearing a "Cincinnati j ersey and some black sweatpants." Houston stated he "didn't have a gun or need one." After the shooting, Houston stated that he and Moore "went back and forth to my mom's house," and that his father gave him a .38 for protection.
 {¶ 42} Houston stated that he has known Rodgers and Jones for years, and that he met Bland for the first time on the night of the shooting. Houston stated that Johnson and another tenant entered the building while the men were on the porch. He also stated that he observed "a young man that was * * * a little bit shorter than me and he had a hood on, and he had a mask covering up his face. * * * I believe he had on shorts and he had a gun that was concealed, * * * up under his shirt. And, he walked up on us and he, * * * said don't move, you know. Like not going to move." Houston "saw him display the weapon," and the men on the porch "ran around towards the east of the building."
 {¶ 43} According to Houston, he and Jones "took off a little before Josh." Houston *Page 21 
"came around the corner and I broke to the right towards the woods back there. And, I tripped and fell in those woods." Houston then ran to Parkhill Avenue. After he fell, Houston's "stomach was hurting really bad," and he was out of breath. Houston stated that he heard the police approaching with their sirens. He observed Zecchini's cruiser and walked toward him, "to make contact with him." Houston testified that he told the officer, "we were just shot at." Houston stated that he was placed in the rear of a cruiser, and that he related what he had observed. Houston stated that he did not hesitate to talk to the officer.
 {¶ 44} According to Houston, on the following Monday, when he and Moore had returned to their apartment, Brookshire and Sylla came to visit him. Houston stated that Moore took the baby inside the apartment, and that he "told them that it was an individual that walked up on us and started shooting * * * at us." According to Houston, he "had my hand on top of the * * * top part of the car and I was like leaning in talking to them. I might have been with one hand maybe just * * * moving like that." Houston denied making the admission attributed to him by Streck. Houston maintained that he was innocent, asserting, "[T]here wasn't nothing for me to mess with him." Houston stated that he, Brookshire and Sylla spoke for 15-20 minutes.
 {¶ 45} On cross-examination, Houston denied telling Rodgers that he was "pissed off about the "Trotwood incident." When asked if he spoke to Jones after the incident in Trotwood and before Bland's murder, Houston stated that he did talk to Jones within that period of time. Houston also admitted that Jones and Rodgers stopped by his apartment earlier on the day of the shooting.
 {¶ 46} Houston asserts three assignments of error. His first assignment of error is as *Page 22 
follows:
 {¶ 47} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY PERMITTING THE STATE TO INTRODUCE EXTENSIVE TESTIMONY REGARDING APPELLANT'S UNSUBSTANTIATED INVOLVEMENT IN ILLEGAL DRUG TRAFFICKING (A.K.A. `THE TROTWOOD INCIDENT.')"
 {¶ 48} According to Houston, the tie between him and the "Trotwood incident" is "at best, tenuous, and at worst, non-existent," and the trial court abused its discretion in admitting the evidence because its probative value was outweighed by "the prejudice done to Houston in depicting him as a major crack dealer."
 {¶ 49} "A reviewing court will not reverse the trial court's admission of evidence absent an abuse of discretion." State v. Bellomy, Montgomery App. No. 21452, 2006-Ohio-7087. "An abuse of discretion connotes more than a mere error of law or judgment. It implies an arbitrary, unreasonable, or unconscionable attitude on the part of the court." Id. (Internal citations omitted).
 {¶ 50} Evid. R. 403(A) provides, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
 {¶ 51} R.C. 2945.59 provides in relevant part, "In any criminal case in which the defendant's motive or intent, * * * is material, any acts of the defendant which tend to show his motive or intent, * * * in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." *Page 23 
 {¶ 52} Finally, Evid. R. 404(B) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, * * * ."
 {¶ 53} "Because R.C. 2945.59 and Evid. R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict. (Citations omitted). The rule and the statute contemplate acts which may or may not be similar to the crime at issue. If the other act does in fact `tend to show' by substantial proof any of those things enumerated, such as proof of motive, * * * *then the evidence of the other act may be admissible."State v. Broom (1988), 40 Ohio St.3d 277, at syllabus 1.
 {¶ 54} The State's evidence showed Houston funded an illegal drug purchase. Evidence that Houston gave Jones money to purchase drugs that later disappeared, sparking Houston's anger at not being compensated, was relevant and admissible, as the trial court determined, for the purpose of proving Houston's motive in shooting Bland. According to the State's theory, Bland was killed after Houston learned that Barnes refused to "cash him out," and after Bland did not pay Houston for the missing drugs. We note that the evidence was closely connected in time to the date of the shooting; the drugs allegedly disappeared on May 12, and Bland was killed May 16, 2007. Since evidence of the Trotwood incident established Houston's motive, the trial court did not err by admitting it.
 {¶ 55} Further, we disagree with Houston's argument that the probative value of the evidence was substantially outweighed by undue prejudice. Prior to Rodgers' testimony regarding the "Trotwood incident," the trial court instructed the jury as follows: *Page 24 
 {¶ 56} "Ladies and gentlemen, I want to give you an instruction at this point about the law and what it provides.
 {¶ 57} "Sometimes testimony can be introduced for a limited purpose.
 {¶ 58} "Testimony here is going to be introduced about events that occurred several days before the death in this case, and those events may involve testimony about some drugs and who did or did not have them.
 {¶ 59} "I'll tell you that this Defendant is not charged with any drug offense. And, this testimony is not going to indicate that the Defendant was present at the time of this prior event.
 {¶ 60} "However, the testimony is going to be allowed in by the Court for the limited purpose to — for you to determine whether or not this testimony may or may not provide evidence of a motive for what happened on the later date at the time of the death of Joshua Bland.
 {¶ 61} "You may not use this evidence for any purpose other than considering that issue."
 {¶ 62} The trial court similarly instructed the jury at the time of Barnes' and Officer McGill's testimony regarding the "Trotwood incident," as well as during the court's final instructions at the close of trial. "A jury is presumed to follow the trial court's instructions.State v. Loza (1994), 71 Ohio St.3d 61, 75 * * * ." State v.Whitfield, Montgomery App. No. 22432, 2009-Ohio-293, ¶ 24. In other words, we presume that the jury did not improperly consider the evidence of the "Trotwood incident" for any purposes other than that it tended to show that Houston had a motive for killing Bland.
 {¶ 63} Since the trial court did not abuse its discretion in admitting evidence of the *Page 25 
"Trotwood incident," and since Houston was not prejudiced thereby, Houston's first assignment of error is overruled.
 {¶ 64} Houston's second assignment of error is as follows:
 {¶ 65} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING A VERDICT OF GUILTY TO THE CHARGE OF MURDER AND THE FIREARM SPECIFICATION THERETO BECAUSE SAID FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 66} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367, ¶ 32.
 {¶ 67} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, *Page 26 
who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 68} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 69} Having thoroughly reviewed the entire record, weighed all the evidence and the reasonable inferences, and considered the testimony of the witnesses, we cannot conclude that the jury herein lost its way and created a manifest injustice. The properly admitted evidence of the "Trotwood incident" established that Houston had a motive for killing Bland. Houston had funded a drug purchase and the drugs were missing. Houston clearly believed the drugs he paid for were in the car with the men during the "Trotwood incident." Barnes testified that Jones and Rodgers came to his apartment and demanded that Barnes or Jones "cash him out" for the missing drugs, and Barnes refused to do so. According to Barnes, Jones threatened "gunplay."
 {¶ 70} Jones and Rodgers then picked Bland up at this girlfriend's home and brought him to Houston's apartment. Houston, Rodgers and Jones all admit to being on the front porch of 2912 Prescott Avenue moments before the shooting. While Edmonds indicated that he observed his "neighbors" with "some kind of weapon," his later testimony made clear that Edmonds observed Houston leave his apartment and head to the porch with an automatic weapon. Moments after Edmonds saw Houston with the gun, Edmonds heard multiple shots and he observed Houston and a second man running across the front porch of the building.
 {¶ 71} While Rodgers, Jones and Houston testified that the encounter on the porch was not hostile, Rodgers and Jones are long-time friends of Houston's. However, Hensley testified *Page 27 
that she heard individuals arguing at the front of the building moments before shots were fired. We note that Edmonds testified without objection that when Moore appeared in the hallway, she "looked at me like she wanted to get out there and stop [Houston] from doing what he was doing."
 {¶ 72} A trail of six casings was observed and documented by Officer Godsey, leading east from the front of the building and around onto the driveway and to Bland's body. There is nothing in the record to suggest that Godsey' investigation of the scene was anything less than thorough. He searched the area more than once, and the number of casings he recovered was consistent with witness testimony about the number of shots fired. The physical evidence established that the shooter was in the vicinity of the front porch and driveway when the weapon was fired, consistent with Houston's location. Houston testified that he "ran around towards the east of the building" from the front porch. The physical evidence was also consistent with Hensley's description of the gunshots she heard, and with first responder Officer Saylor's testimony about the location of the casings. All of the casings were fired from the same gun, and Duerr confirmed the casings were fired from a semi-automatic weapon.
 {¶ 73} Officer Zecchini testified that, upon arrival in the area, he observed Houston bent over, looking at the ground. Yet, Houston maintained that he observed the officer and intentionally approached him. Zecchini's testimony, if believed, suggests that Houston merely stopped to catch his breath in the course of fleeing the scene, that he was unaware of the officer and, accordingly, that he did not intend "to make contact" with Zecchini.
 {¶ 74} Houston claimed that he observed a man shorter than himself wearing a hood and shorts display a weapon and fire at the men on the porch. His friend, Jones, also asserted that *Page 28 
he observed the shooter approach the porch area wearing a "hooded jacket or a hooded sweatshirt and shorts." However, Edmonds, an impartial witness, did not see anyone else in the area when he observed Houston running across the porch. The jury could have simply chosen to reject the testimony of Houston and Jones, but credit the testimony of Edmonds as well that of other State witnesses.
 {¶ 75} Streck's testimony was particularly damaging. She testified that she observed an agitated Houston, through an open window in apartment 208, in the driveway area speaking to the male and female occupants of a brown car four days after the shooting. Streck's testimony, "He just stated that he had his stuff on the car and the white dude wouldn't leave his shit alone. That's why he got shot, and that's why I shot him," was unequivocal. Streck testified that nothing obstructed her view, and she insisted that she did not misunderstand Houston's words due to the racial and age differences between them. Streck recognized Houston as the tenant who lived next to the manager's office, and she identified him in a photo display. Streck's testimony regarding what she overheard corroborates the motive evidence from the "Trotwood incident," and there is nothing in the record suggesting that she had any prior knowledge of the events.
 {¶ 76} In sum, if believed, the testimony of Rodgers, that Jones threatened Barnes, and the testimony of Barnes, that Jones demanded that he or Bland "cash him out," and the testimony of Edmonds, that Houston carried a weapon under his arm as he walked to the porch, and the testimony of Streck, that she clearly overheard Houston admit to killing "the white dude," and the testimony of Hensley, that she overheard arguing on the porch moments before gunshots, the sound of which faded away to the east, and the testimony of Officers Saylors and *Page 29 
Godsey, that bullet casings lead from the front porch east to Bland's body, belies Houston's assertion that his conviction is against the manifest weight of the evidence. The jury observed and heard the testimony of all the witnesses, and they were free to conclude, as they clearly did, that Rodgers', Jones', Brookshire's, Sylla's and Houston's versions of events were not credible, and we must defer to the factfinder's assessments of credibility. Houston's convictions for murder and the firearm specification are not against the manifest weight of the evidence, and Houston's second assignment of error is overruled.
 {¶ 77} Houston's third assignment of error is as follows:
 {¶ 78} "THE CUMULATION OF MULTIPLE ERRONEOUS RULINGS BY THE TRIAL COURT SERVED TO DENY APPELLANT A FAIR TRIAL AND DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE US CONSTITUTION."
 {¶ 79} The cumulative errors of which Houston complains are as follows: (1) "several times during the trial both prosecutors gave arguments on the same legal point against defense," despite a trial court order to the contrary; (2) the trial court did not allow Houston to cross-examine Rodgers regarding the substance of his prior statements; (3) the trial court did not allow Houston to "impeach * * * Streck, a middle-aged white woman, as to whether she might be misinterpreting the comments which she had imputed to Houston because of `speaking differences' between people of different age groups and/or races," and (4) the trial court did not allow Houston to "put on testimony through its private investigator/detective and to introduce photos which purportedly would demonstrate that the window where * * * Streck [stood] was too far away from the spot where Houston was talking to his friends for her to unmistakenly *Page 30 
hear what Houston said." According to Houston, the above alleged cumulative errors, "especially in concert with" the trial court's decision to admit evidence of the Trotwood incident, denied him a fair trial.
 {¶ 80} "[Separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. State v.Madrigal, 87 Ohio St.3d 378, 721 N.E.2d 52, 2000-Ohio-448. In order to find `cumulative error' present, we must first find that multiple errors were committed at trial. Id. at 398, 721 N.E.2d 52. We must then find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors.State v. Thomas, Clark App. No. 2000-CA-43, 2001-Ohio-1353." State v.Kelly, Greene App. No. 2004-CA-20, 2005-Ohio-305, ¶ 33. "Where no individual, prejudicial error has been shown, there can be no cumulative error. State v. Blankenship (1995), 102 Ohio App.3d 534, 557,657 N.E.2d 559." State v. Jones, Montgomery App. No. 20349, 2005-Ohio-1208, ¶ 66.
 {¶ 81} First, as the State correctly notes, regarding his first enumerated error, Houston did not include in his brief "* * * reference to the place in the record where each [assigned] error is reflected," or "citations to the * * * parts of the record on which appellant relies." App. R. 19(A)(3), (7). Since Houston offers only a conclusory assertion regarding being "double teamed," and he fails to direct our attention to evidence in the record in support of his first alleged error, we will not address it.
 {¶ 82} Regarding Houston's second alleged error, during the direct examination of Rodgers, the State sought to impeach Rodgers' testimony that he did not see "the shooter" with Rodgers' prior inconsistent statements to the police. During a bench conference, the trial court *Page 31 
advised the State that the evidence of Rodgers' prior inconsistent statements could be used for impeachment purposes only and not as substantive evidence of Houston's guilt. During the conference, Houston then sought the court's permission to introduce the videotaped interview of Rodgers, in which he allegedly "disavows any and all arguments about a drug-motivated situation" and the existence of "bad blood" between Houston and Bland. The following exchange then occurred:
 {¶ 83} "THE COURT: * * * what you're raising is a separate issue from what I'm talking about with the State right now.
 {¶ 84} "Because what you're raising is, you are saying that there is a prior consistent statement that would be brought in contrary to the prior inconsistent statement.
 {¶ 85} "But, if he on the stand says, I told Dick Evans A, B, C and D you don't get to use the tape, period.
 {¶ 86} * *
 {¶ 87} "If he says on the stand, yes I told Dick Evans this was a lie, this was a lie, that was a lie then that statement does not come in, period.
 {¶ 88} "MR. HARRISON: Well, then I never — I can still cross-examine him about what he said?
 {¶ 89} "THE COURT: You can ask him what he said, but if he says that's what * * * happened, it doesn't come in.
 {¶ 90} "Now, let me get back to this issue.
 {¶ 91} "If you want to specifically ask him questions, did you say so-and-so. But, I'm not going to get into this — this witness is not capable of making rational sense out of going *Page 32 
through all these statements without confusing the jury and confusing me.
 {¶ 92} "He's just not capable.
 {¶ 93} "So, If you want to direct a specific issue, a specific question, I'm going to allow you to do that. But, I'm not going to let you get into a wholesale inconsistent statement as to what he is saying just for purposes of impeachment because it's not going to be substantive evidence anyway."
 {¶ 94} Our review of the record reveals that Houston's argument that "the trial court refused to permit defense to question Rodgers about the substance of the other four statements, stating that would be confusing to the jury," misrepresents the subject of the trial court's ruling. As the State asserts, while Rodgers spoke to the police several times and also provided a videotaped statement to the defense investigator, there were only two versions of the events he related. Rodgers told the police that Bland and Houston argued, and he told them that they did not. The trial court determined that the videotaped statement disavowing "bad blood" between Houston and Bland, which Houston wanted to use to rebut Rodgers' prior statements to police that Houston was angry at Bland, would not be admissible if Rodgers' trial testimony was consistent with his videotaped statement. Houston wanted to cross-examine Rodgers about his statement to the defense investigator, not about "the other four statements" to the police. The concern about jury confusion that Houston refers to was in fact directed to the prosecution's attempts to impeach Rodgers, not Houston's arguments regarding the videotape. At trial, Rodgers denied telling police that Houston and Jones had a heated conversation, and that Houston and Bland struggled before Bland was shot. Thereafter, Houston did not seek to introduce the videotape, ostensibly because it was consistent with his trial testimony. Thus, we *Page 33 
find no error in the court's ruling.
 {¶ 95} Regarding Houston's cross-examination of Streck, Houston again misrepresents the record. Defense counsel directed the jury's attention to the differences in age and race between Houston and Streck. Defense counsel then asked Streck, "* * * you want this jury to understand and believe that you could understand clearly these young people talking animatedly and perhaps what might be street talk?" The State's objection was overruled, and Streck definitively testified that she understood what Houston said. Defense counsel asked no more questions on the subject. We conclude that Houston's assertion that he "was not permitted by the trial court to explore [Streck's possible misinterpretation of Houston's words] or even imply that it exists" is erroneous. Again, we find no error.
 {¶ 96} Finally, Houston asserts that the trial court erred in not allowing him to introduce, by means of his investigator, photographs that purportedly demonstrated that the area where Houston stood when he admitted killing Bland was too far away from the window where Streck stood for her to be able to hear Houston. The State had not seen the recently taken photos, and it argued, "this is absolutely not fairly and accurately depicted in terms of what happened back on the date that Cecelia mentioned of May 21st that she saw a brown car pull up and she heard what she heard and she saw what she saw." The trial court determined, "* * * I'm not sure [Streck] testified where the car is, but whether or not she testified where the car is certainly Mr. Saloum [sic] and Mr. Brookshire testified where the car was, which means that that is something that if there is any discrepancy or dispute, something within the knowledge of the defense as to where that car was. Furthermore, the production of these at this late hour is not appropriate for the State to have an opportunity to counteract or to find some evidence contrary *Page 34 
to that, or to find an exhibit contrary to that. If this is what you were going to call Mr. Emmons for I'm not going to allow you to use these photos. I will accept as a proffer that if he were called to testify * * * ."
 {¶ 97} While the trial court's discussion regarding the testimony of Streck, Brookshire and Sylla is not entirely clear, we do not agree, as Houston asserts, that the court "did not feel that the defense had established where the car and conversation occurred relative to unit # 208." We see no error in the trial court's exclusion of the photographs. The State had not been given copies before trial, and the defense had an obligation to provide reciprocal discovery. Further, in the course of their testimony, Streck, Brookshire and Sylla each indicated on a photograph for the jury where the disputed conversation took place.
 {¶ 98} Having reviewed the above arguments, it is clear that Houston has not identified any prejudicial errors, and we accordingly cannot find cumulative error. Houston's third assignment of error is overruled, and the judgment of the trial court is affirmed.
FAIN, J. and FROELICH, J., concur. *Page 1