[Cite as *State v. Hendrix*, 2013-Ohio-638.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2012-L-080** |
| ERIN HENDRIX, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 10 CR 000588.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Timothy Young,* Ohio Public Defender, and *Katherine A. Szudy* and *Stephen A. Goldmeier, A*ssistant Ohio Public Defender, 250 East Broad Street, Suite 1400, Columbus, OH 43215-9308 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Erin Hendrix, appeals from the judgment of the Lake County Court of Common Pleas dismissing her petition for postconviction relief without a hearing. For the reasons discussed in this opinion, we affirm the trial court's judgment.

{¶2} On September 29, 2010, appellant was secretly indicted on twenty-two felony charges involving the lead poisoning of her daughter, H.H. The first six counts of the indictment charged appellant with contaminating a substance with lead or lead

nitrate for human consumption or use, in violation of R.C. 2927.24(B)(1), all first-degree felonies. (Counts 1 through 6) Counts 1, 3, and 5, alleged a penalty enhancement specification that the amount of lead or lead nitrate involved was sufficient to cause death. Counts 2, 4, and 6 alleged a penalty enhancement specification that the offenses resulted in serious physical harm to the victim

{¶3} Appellant was also charged with attempted aggravated murder, in violation of R.C. 2903.01(C) and R.C. 2923.02(A), a first-degree felony (Count 7); attempted felony murder, in violation of R.C. 2903.02(B) and R.C. 2923.02(A), a first-degree felony (Count 8); felonious assault, in violation of R.C. 2903.11(A)(1), a second-degree felony (Count 9); and two counts of endangering children, in violation of R.C. 2912.22(A) and R.C. 2912.22(B)(1), third- and second-degree felonies, respectively (Counts 10 and 11). The remaining eleven counts in the indictment were complicity charges mirroring the first eleven counts, although out of order; to wit: Count 12 alleged complicity to aggravated murder; Count 13 alleged complicity to attempted felony murder; Count 14 alleged complicity to felonious assault; Count 15 alleged complicity to endangering children; Count 16 alleged complicity to endangering children; and Counts 17 through 22 alleged complicity to contaminating a substance for human consumption or use, each setting forth the same penalty enhancement specification listed in Counts 1 through 6. Appellant pleaded "not guilty" to the charges.

{¶4} On February 28, 2011, the matter proceeded to jury trial after which appellant was found guilty of felonious assault, both counts of endangering children, and 11 counts of complicity. She was acquitted of the first eight counts in the indictment alleging she was the principal offender in all crimes. The trial court merged all foregoing

2

counts with Count 18 thereby entering a judgment of conviction on one count of complicity to contaminating a substance for human consumption or use that resulted in serious physical harm to the victim. Appellant was subsequently sentenced to life imprisonment with parole eligibility after 15 years.

{¶5} Appellant appealed and, in *State v. Hendrix*, 11th Dist. No. 2011-L-043, 2012-Ohio-2832, this court affirmed the trial court's judgment of conviction. Appellant subsequently filed an application to reopen her appeal which was denied. Appellant also filed a timely petition for postconviction relief. The trial court denied this petition without a hearing. It is from this judgment appellant now appeals asserting the following assignment of error:

{¶6} "The trial court erred in dismissing Mrs. Hendrix's petition without an evidentiary hearing because Mrs. Hendrix provided sufficient evidence that she was denied the effective assistance of counsel and that the State failed to conduct Mrs. Hendrix's trial in accordance with Ohio's rules of evidence."

{¶7} A defendant attempting to challenge a conviction or sentence through a petition for postconviction relief under R.C. 2953.21 is not automatically entitled to a hearing. *State v. Calhoun,* 86 Ohio St.3d 279, 282, (1999). A court is not required to hold a hearing unless the petitioner puts forth evidence demonstrating a cognizable claim of constitutional error. R.C. 2953.21(C); *see also State v. Adams,* 11th Dist. No. 2003-T-0064, 2005-Ohio-348, ¶36. That is, a petitioner must put forth evidence that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * *." R.C. 2953.21(A)(1)(a). "Pursuant to R.C. 2953.21(C), a defendant's

3

petition may be denied without a hearing when the petition, supporting affidavits, documentary evidence, files, and records do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Adams, supra*, citing *Calhoun, supra*, at 281. An appellate court reviews the dismissal of a petition for postconviction relief for an abuse of discretion. *Id.*

{¶8}　Additionally, a petition for postconviction relief does not afford a defendant a second opportunity to litigate her conviction. *State v. Towler*, 10th Dist. No. 05AP-387, 2006-Ohio-2441, ¶6. Pursuant to the doctrine of res judicata, "a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or *could have been raised* by the defendant at trial, which resulted in that judgment of conviction, or *on an appeal* from that judgment." (Emphasis added.) *State v. Perry*, 10 Ohio St.2d 175 (1967), syllabus. "Where defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing defendant's petition for postconviction relief." *State v. Cole*, 2 Ohio St.3d 112 (1982), syllabus (1982) *see also State v. Mike*, 11th Dist. No. 2007-T-0116, 2008-Ohio-2754, ¶11; *State v. Reynolds*, 79 Ohio St.3d 158, 161 (1997). This doctrine applies with equal force to any alleged constitutional error. *State v. Jones*, 11th Dist. 2000-A-0083, 2002-Ohio-2074.

{¶9}　Appellant premises her first several arguments upon her trial counsel's alleged ineffectiveness. Trial counsel may be deemed ineffective if an appealing party

demonstrates "(1) counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). If a deficiency in counsel's performance is found, the appellant must then show that prejudice resulted. *State v. Swick*, 11th Dist. No. 97-L-254, 2001 Ohio App. LEXIS 5857, *5 (Dec. 21, 2001).

{¶10} Appellant's ineffectiveness arguments assert that her counsel's performance was prejudicially deficient for failing to employ an expert to review the CDC's report and contest the conclusions and testimony of Dr. Lawrence Quang. In support, appellant submitted the affidavit of Joseph Sachleben, Ph.D., a physical chemist. Dr. Sachleben's affidavit asserts Dr. Quang improperly or misleadingly testified a report analyzing three separate lead samples filed by the CDC indicated that multiple lead sources had been combined and given to the victim. In Dr. Sachleben's view, the CDC's report actually concluded that none of the given samples could be primarily responsible for the lead in the victim's body. Thus, Dr. Sachleben's affidavit takes issue with Dr. Quang's interpretation of the CDC's report and avers Dr. Quang's testimony served to misrepresent the conclusions of the report's authors. Although the affidavit is evidence dehors the record, we hold the issue of whether appellant's trial counsel was ineffective for failing to employ an expert could have fairly been determined without this evidence.

{¶11} At trial, the prosecution introduced testimony of Dr. Cathleen Caldwell, a laboratory chief in the inorganic and radiation analytical toxicology branch of the CDC,

5

and Dr. John Osterloh, chief medical officer at the division of laboratory sciences at the CDC. Both doctors' testimony related to their analysis of the lead isotope ratios in three lead nitrate samples, one taken from appellant's home and two from the high school chemistry lab where appellant formerly worked, in comparison to the lead isotope ratio found in H.H.'s blood and urine. The report issued by Dr. Caldwell and Dr. Osterloh found the lead isotope ratios to be either "clearly different" or "very different" from the ratios from H.H.'s specimen. From this, the doctors each testified that the samples could not be either excluded or identified as contributing to the lead in H.H.'s specimen.

{¶12} Dr. Quang, who testified that he had significant training and experience as a toxicologist in analyzing isotopes, later opined the report's conclusion was predictable because, when lead nitrate samples from several separate sources are mixed, it would be unlikely for the lead isotope ratios in the victim to be consistent or uniform with any of the individual sources. Specifically, he testified:

{¶13} Remember, lead is obtained from mines. Okay? Different mines have different proportions of 206, 207, 208 [lead isotopes]. But if the lead nitrate from one mine is used solely as the source of exogenous introduction of lead, then the analysis of the ratio of 208 to 206, and 207 to 206 in the product should match that ratio analysis in the blood and urine, if it's a single product.

{¶14} ***

{¶15} If there's one source it would match. If there's one source used throughout, it would match. If there are multiple sources with different ratios, and all those sources are used at different times,

6

then what's in [H.H.'s] body represents the ratios from different sources. Not any one source. * * *

{¶16} ***

{¶17} I'll use the analogy of marbles and glasses. Okay? Say I have a beaker, one beaker here. And another beaker here. And I have different color marbles in each one. Okay? Say I have blue marbles here, to represent one specific isotope ratio of lead. And this one I have different color marbles to represent a different ratio of 207 to 206 and 208 to 206. * * * If I, if only one lead source with this isotopic ratio is added into here, and this is the body of a patient, then what would be in here are what? Blue marbles, right? If I were to test the ratio of this beaker and test the ratio * * * of this beaker, it would do what? It would match. Right? Because only one source was used. Now imagine this has been given already. At a later point in time, this is now added. A different lead source with a different isotope ratio. Okay? You add this now in here - - these are still in there. But now you have this. Now you can see when you test the body, okay - - the blood and urine, the body. That's what this represents. It's gonna give you a separate point that would, a different ratio that would represent this mixture. Okay? And it will be blue and red, and it won't therefore match what? Just red. Or just blue. And then if there's even more sources, that makes it even less likely to ever pinpoint what source.

Because different sources of lead really have different ratios. And I think the CDC even showed that. That we tested 3 samples, and all 3 samples had different ratios. So if you add all 3 samples into the body and you measure what's in the body in the form of blood and urine, that ratio is gonna reflect all 3 mixed together. Not any one source. And it will never match.

{¶18} Dr. Quang was later questioned on cross-examination about the plausibility, given the inconclusive nature of the CDC's report, that the lead nitrate in H.H.'s system came from a source other than the samples analyzed. The doctor noted that samples one, two, and three were the only samples recovered and, thus, in his opinion, such a scenario would be unlikely. Defense counsel pointed out that, notwithstanding the testimony regarding the manner in which mixed isotopes react, Dr. Quang was assuming what the prosecution had failed to establish; namely, that all three samples were actually utilized as a source. In response, Dr. Quang simply testified that, in light of his experience with H.H.'s case in conjunction with the behavior of lead isotopes when mixed, samples one, two, and three were plausible sources of H.H.'s poisoning.

{¶19} Moreover, at no point did Dr. Quang assert, based upon his interpretation of the CDC report, that he could draw a "definitive conclusion" regarding the source of the lead that contaminated H.H. In fact, on cross-examination, defense counsel pointed out that Dr. Quang's testimony indicated that none of the three tested samples may have been an actual source of the poisoning. Defense counsel was therefore able to reemphasize, through Dr. Quang, that, even though the three samples could not be

8

excluded, there was simply no way of conclusively identifying them as contributing sources.

{¶20} Trial counsel's cross-examination effectively attacked Dr. Quang's testimony regarding the implications of the CDC report without recourse to an expert. Indeed, the cross-examination effectively brought forth the points emphasized by Dr. Sachleben in his affidavit and, in this respect, a defense expert could have been viewed as unnecessarily cumulative. Further, even had trial counsel employed Dr. Sachleben, it is not clear counsel would have called him as a witness as the report accompanying the doctor's affidavit notes that as much as "35% of the lead found in the victim could have come from any of the lead nitrate samples." Trial counsel could have reasonably determined that this point alone would be sufficiently difficult to explain away on re-direct. We therefore hold the evidence within the record demonstrates that the decision not to employ an outside expert was reasonable and strategic. Appellant's arguments relating to counsel's failure to employ an expert could have been fairly resolved without recourse to Dr. Sachleben's affidavit and are therefore barred by res judicata.

{¶21} Appellant next argues that counsel was ineffective for failing to object to the introduction of the three lead nitrate samples into evidence. Appellant contends that, pursuant to the CDC report, none of the samples matched the samples taken from H.H. and therefore the risk of prejudice significantly outweighed their probative value. There is nothing to suggest, and appellant does not claim, that this potential issue could not have been resolved without recourse to evidence dehors the record. We therefore hold it is also barred by res judicata.

**{¶22}** Appellant next contends her right to confrontation was violated when Dr. Quang was permitted to offer his expert interpretation of the report without an opportunity to cross-examine the authors, Drs. Caldwell and Osterloh, as experts. Appellant asserts Dr. Quang was not qualified as an expert and thus his opinions on the chemistry involved cannot be considered reliable. And, although Drs. Caldwell and Osterloh were available for cross-examination, she claims they testified only as fact witnesses regarding their findings. Thus, appellant argues, she was deprived of the right to confront Drs. Caldwell and Osterloh regarding the accuracy of their results as well as the ultimate implications of their inconclusive findings. Similar to her previous arguments, nothing suggests, and appellant does not argue, these points could not have been resolved during her direct appeal without use of evidence dehors the record.[1] The arguments are therefore barred by res judicata.

**{¶23}** Appellant next contends she was entitled to a hearing on her motion because she provided sufficient evidence of prosecutorial misconduct, which violated her right to due process. In particular, appellant contends that Crim.R. 16(K) was violated when the state failed to alert the defense it intended to use Dr. Quang as an expert. Appellant further asserts that, in light of this intention, the state elicited expert testimony without having Dr. Quang qualified as an expert. We fail to perceive, and appellant does not argue, that these issues could not have been determined on direct appeal without utilizing evidence dehors the record. We therefore conclude they are barred by res judicata.

---

1. Arguments very similar to these were raised and rejected in appellant's application to reopen her direct appeal. They are also res judicata for this reason.

{¶24} For the following reasons, we find the arguments asserted in appellant's petition for postconviction relief could fairly have been asserted and determined on direct appeal without recourse to evidence dehors the record. Pursuant to the doctrine of res judicata, we therefore conclude appellant is precluded from litigating these issues via a petition for postconviction relief. Accordingly, the trial court did not err in dismissing appellant's petition without a hearing.

{¶25} Appellant's assignment of error is without merit.

{¶26} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed.

TIMOTHY P. CANNON, P.J.,

DIANE V. GRENDELL, J.,

concur.

11